IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES D. ZEHRING, JR.,

           Plaintiff,

   v.

JAMIE SORBER, et al.,

          Defendants.

CIVIL ACTION
NO. 20-3195

## OPINION

**Slomsky, J.**                                 **December 1, 2020**

### TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 1

II. BACKGROUND ............................................................................................................. 2

  A. Inmates' Custody Levels and Housing Assignments ........................................................ 3

  B. Plaintiff's Custody Level and Housing Assignment ......................................................... 4

  C. June 18, 2020 "Same Side Work/Housing" Policy (the "Policy") ..................................... 5

  D. Plaintiff's Work as a Certified Peer Support Specialist ("CPSS") ..................................... 7

  E. The Instant Litigation and Plaintiff's Housing Reassignment ........................................... 8

  F. Plaintiff's Petition for Temporary Restraining Order ...................................................... 9

  G. Plaintiff's Exhaustion of the PA DOC Administrative Review Process .......................... 10

III. STANDARD OF REVIEW .......................................................................................... 11

IV. ANALYSIS ................................................................................................................... 12

  A. Plaintiff Has Not Shown That He Is Likely to Succeed on the Merits

    of His Section 1983 Claim .............................................................................................. 12

1.   Plaintiff Has Not Established the Elements of a First Amendment
     Retaliation Claim .................................................................................................. 13

2.   The Court Lacks the Authority to Order Plaintiff's Requested Relief .......................... 26

3.   Plaintiff Has Not Satisfied the Administrative Exhaustion Requirement .................... 28

B.   Denying Plaintiff's Requested Relief is Unlikely to Cause Irreparable Harm ................ 31

C.   Plaintiff Has Failed to Establish that the Balance of Equities Tip in His Favor .............. 33

D.   Plaintiff's Requested Relief is Not in the Public Interest .................................................. 34

V.   CONCLUSION ................................................................................................................. 34

## I.    INTRODUCTION

On June 26, 2020, Plaintiff Charles Zehring ("Plaintiff"), a pro se inmate at the State Correctional Institution at Phoenix ("SCI Phoenix"), initiated the present action by filing a Complaint.  (See Doc. No. 2.)  In his Complaint, Plaintiff asserts that Defendants Superintendent Jamie Sorber ("Supt. Sorber"), Deputy Secretary Tammy Ferguson, Director Joseph Silva, Medical Director Stephen Wiener, M.D., and Lee Hanuschak, M.D., committed various constitutional violations, triggering civil liability under 42 U.S.C. § 1983 (commonly referred to as "Section 1983").  One month later, on July 30, 2020, Plaintiff filed the instant Petition for Temporary Restraining Order (Doc. No. 16) against Defendants Sorber, Ferguson, and Silva ("Defendants"). In his Petition, Plaintiff argues that Defendants changed his housing assignment in retaliation for his filing of administrative grievances and the instant litigation.  (See Doc. No. 16 at 1; Doc. No. 22 at 1.)

Plaintiff seeks injunctive relief requiring Defendants to modify his housing assignment and to refrain from any further alleged retaliation against him.  (See Doc. No. 16 at 1, 4.)  Alternatively, Plaintiff requests a hearing on the matter.  (See id. at 4; Doc. No. 33 at 1.)  Plaintiff's Petition for Temporary Restraining Order ("Petition") is now ripe for review.  For reasons discussed below, the Petition will be denied.[1]

---

[1]  In ruling on the Petition, the Court has considered the following: the Petition for Temporary Restraining Order (Doc. No. 16), Plaintiff's Declarations in Support of and Addendums to the Petition (Doc. Nos. 22, 39, 50, 54), Commonwealth Defendants' Memorandum of Law in Opposition to Plaintiff's Petition (Doc. No. 25), Plaintiff's Motion Requesting Hearing on Petition (Doc. No. 33), Plaintiff's Addendum to Motion Requesting Hearing (Doc. No. 32), Commonwealth Defendants' Reply in Opposition to Plaintiff's Motion for Hearing and Addendum (Doc. No. 34), Plaintiff's Motion to Exclude Commonwealth Defendants' Memorandum of Law in Opposition to Plaintiff's Petition and Rebuttal to Commonwealth Defendants' Reply in Opposition to Plaintiff's Motion for Hearing (Doc. No. 35), Commonwealth Defendants' October 12, 2020 Letter to the Court (Doc. No. 46), and Plaintiff's Response to Commonwealth Defendants' Letter to the Court (Doc. No. 55).

## II.      BACKGROUND

Plaintiff is a 63-year-old veteran serving a life sentence at SCI Phoenix. (See Doc. No. 16 at 1, 2; Doc. No. 25 at 2; Doc. No. 55 at 1.) SCI Phoenix is divided into East and West sides, each containing numerous housing "units." (See Doc. No. 16 at 1, 2; Doc. No. 46 at 1; Doc. No. 55 at 1.) Each housing "unit" is situated upon a "block" and each "block" is designated by letter. (See id.)

At the prison, Plaintiff works as a Certified Peer Support Specialist ("CPSS") under the supervision of Jaime Luquis, Certified Peer Support Coordinator. (See Doc. No. 16 at 3; Doc. No. 22 at 2, 11.) As a CPSS, Plaintiff is assigned to work in different housing units located throughout the prison ("Work Assignments"). (See Doc. No. 22 at 2, 11, 14-18.) During the relevant time period, Plaintiff worked primarily on the East side of SCI Phoenix. (See Doc. No. 16 at 3; Doc. No. 22 at 11, 14-18.) Plaintiff's CPSS Work Assignment was modified twice in the past 22 months. (See Doc. No. 22 at 2, 11, 14-18; Doc. No. 55 at 2, 3.)

In January 2019, Plaintiff was living in a housing unit on the East side of SCI Phoenix and working in the "Chapel East" and the "Infirmary-POC-SOU"[2] located on the West side. (See Doc. No. 22 at 11, 15. See also Doc. No. 55 at 2, 4.) On January 9, 2019, Luquis modified Plaintiff's Work Assignment to "B-Unit SRTU/DTU."[3] (See Doc No. 22 at 11, 15; Doc. No. 55 at 2.) The DTU is located on the West side of the prison. (See Doc. No. 46 at 1; Doc. No. 55 at 2.) Plaintiff

---

[2]   "POC" is an acronym for "Psychiatric Observation Cell." (Doc. No. 55 at 2.) See also 13.8.1 Access to Mental Health Care, § 3(D), PA. DEP'T OF CORR. (Dec. 23, 2019), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.08.01%20Access%20t o%20Mental%20Health%20Care.pdf. "SOU" is an acronym for "Special Observation Unit." (Id.) See also 13.8.1 Access to Mental Health Care, at 3, supra.

[3]   "SRTU" is an acronym for "Secure Residential Treatment Unit." See 13.8.1 Access to Mental Health Care, § 2(E)(1)(b), supra. "DTU" is an acronym for "Diversionary Treatment Unit," which Plaintiff describes as a "Restricted Housing Unit for inmates with severe mental illnesses." (Doc. No. 16 at 3.)

states that Luquis modified his Work Assignment in January 2019 for the sole purpose of justifying Plaintiff's transition to a full-time work schedule and that, despite this "job label," he never actually worked in the DTU on the West side.  (See Doc. No. 22 at 2; Doc. No. 54 at 1; Doc. No. 55 at 2.)  Rather, he remained working in the "Chapel East" and "Infirmary-POC-SOU" on the West side until April 10, 2019, when the latter Work Assignment was switched to "P-Unit" on the East side.[4]  (See Doc. No. 22 at 2, 16; Doc. No. 55 at 2, 4.)

On June 18, 2020, the administration at SCI Phoenix "began a process of separating the prison between the East and West sides, for security purposes[,] . . . [by] reassigning inmates' housing assignments so that they would match [their] job assignment locations" (the "Policy"). (Doc. No. 46 at 1.)  Pursuant to the Policy, on July 16, 2020, Plaintiff was relocated from the East side of the prison to the West side.  (See id.; Doc. No. 16 at 2.)

### A.    Inmates' Custody Levels and Housing Assignments

The Pennsylvania Department of Corrections ("PA DOC") assigns a custody level to each inmate committed to its care pursuant to Department Policy 11.2.1 ("Classification Policy").  See 11.2.1 Reception and Classification, PA. DEP'T OF CORR. (Jan. 21, 2011), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/11.02.01%20Reception%20 and%20Classification.pdf.  Under the Classification Policy, an inmate's custody level is determined using the Pennsylvania Additive Classification Tool ("PACT").[5]  The PACT is defined as an "objective," "behavior driven" instrument for "ascertaining appropriate custody levels for

---

[4]   Plaintiff continued to work at the "Chapel East" location through January 2020.  (See Doc. No. 22 at 17.)

[5]   The PACT has since been replaced with the Prison Risk Assessment Tool ("PRAT").  See Coleman v. Wetzel, No. 15-847, 2019 U.S. Dist. LEXIS 120719, at *5 n.5 (M.D. Pa. July 18, 2019).

inmates," which is "designed to reduce over-classification of inmates resulting in the[ir] placement . . . in the least restrictive security level based on an objective assessment of his/her custody needs." 11.2.1. Reception and Classification, Glossary, supra.  "After evaluating certain risk and stability factors, the PACT assigns custody levels ranging from one to five, with levels two to four pertaining to general population inmates." Coleman v. Wetzel, No. 15-847, 2019 U.S. Dist. LEXIS 120719, at *5 (M.D. Pa. July 18, 2019).  "Custody level 5 is the most restrictive level and inmates assigned to this level should be housed in units with a security level rating of 5." 11.2.1. Reception and Classification, Glossary, supra.

Pursuant to the Classification Policy, inmates' custody levels may also be modified to "promotional status" based on "custody level incentives." Fortune v. Wetzel, No. 644 M.D. 2012, 2013 Pa. Commw. Unpub. LEXIS 493, at *1 n.1 (Pa. Commw. Ct. June 27, 2013).  The Classification Policy sets forth "minimum standards regarding a program of incentives" and states that "[a]dditional programs of incentives may be developed at the facility or housing unit level, based upon available resources." 11.2.1. Reception and Classification, § 6, supra.  Under this program, "[a]n inmate at a less restrictive custody level may be rewarded through a progressive system of program incentives and privileges consistent with his/her custody level." Id.

### B.   Plaintiff's Custody Level and Housing Assignment

Plaintiff classifies himself as a "minimum security inmate" with a custody level of "2-3Y." (Doc. No. 16 at 2.)  He explains that "2-3Y" is a "custody level [that] the PA DOC uses for life-sentenced prisoners who meet the level 2 criteria but for bureaucratic reasons unrelated to [the] inmate's actual behavior requires that they not be over-ridden and [classified as] level 2 inmates." (Doc. No. 55 at 1.)  "Functionally, a level 2-3Y is the same as a level 2 and serves as such to place life-sentenced prisoners on honor blocks where level 3 prisoners are not permitted to be housed."

(Id.)  The "honor block" to which Plaintiff refers is the Veteran's Housing Unit ("VHU") located in the "'S' block . . . on the East side of the prison."  (Doc. No. 46 at 1.  See also Doc. No. 16 at 1; Doc. No. 22 at 2.)

Defendants submit that "Plaintiff is a Custody Level 3 inmate."  (Doc. No. 46 at 1.) "Custody Level 3" is a "level assigned to inmates who are permitted reasonable freedom of movement within designated areas of the facility. . . ."  11.2.1. Reception and Classification, Glossary, supra.  Such inmates exhibit "non-assaultive" behavior and "require frequent, direct supervision."  Id.[6]

Plaintiff states that on September 18, 2019, he was moved to the VHU in the "'S' block . . . on the East side of the prison" after he "requested and was selected to live on this unit and to participate in its program[m]ing."  (Doc. No. 16 at 1; Doc. No. 46 at 1.  See also Doc. No. 22 at 2, 11.)  He describes the VHU as a "preferential unit designed to specifically benefit veterans" that mainly houses inmates with a custody "[l]evel [of] 2 and 3."  (Doc. No. 22 at 4.)

C.     June 18, 2020 "Same Side Work/Housing" Policy (the "Policy")

In June 2020, the administration at SCI Phoenix "began a process of separating the prison between the East and West sides, for security purposes."  (Doc. No. 46 at 1.)  "As part of this effort, SCI Phoenix began reassigning inmates' housing assignments so that they would match

---

[6]   In contrast, the Classification Policy defines "Custody Level 4" inmates as those "who require a high degree of supervision[]" and "who, through a demonstrated pattern of maladjustive behavior, need continuous direct and indirect supervision."  11.2.1 Reception and Classification, Glossary, PA. DEP'T OF CORR. (Jan. 21, 2011), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/11.02.01%20Reception%20and%20Classification.pdf.  They "may be occasionally assaultive[,] . . . are permitted access to selected programs and jobs within the facility[,] . . . and are under constant observation and/or escort when moving throughout the facility individually or in groups."  Id.

inmates' job assignment locations."  (Id.)  Defendants state that "[t]he housing reassignments for SCI Phoenix were expansive and entailed several hundred inmate moves."  (Id.)

On June 18, 2020, the SCI Phoenix Office of the Superintendent released an "Information Bulletin" regarding the impending implementation of the Policy ("Policy Notice").  (See Doc. No. 39 at 3.)  In the Policy Notice, Supt. Sorber informed inmates that:

> [The institution] is in the process of implementing housing individuals on the same side of the institution [as] their work assignment.  If an individual decides not to move to their new housing location[,] they will be permitted to remain in their current housing but will forfeit their current work assignment.

(Doc. No. 39 at 3.)  Inmates' option to forfeit their "current work assignment" in order to remain in their "current housing" was further explained as follows:

> The individual will be removed from their current work assignment utilizing a Unit Team Staffing and placed on GLP and given the opportunity to be placed in a future work assignment by requesting placements on the waiting lists or upon reassignment by Inmate Employment based on institutional needs.

(Id.)  The effect of this policy was to move inmates' housing to the side of the prison—East or West—where their current Work Assignment was located.  (See Doc. No. 46 at 1.)  "Pursuant to these prison changes, Plaintiff was moved from his housing assignment on the 'S' block, located on the East side of the prison, to the 'H' block, located on the West side of the prison."  (Id.)  On or about October 21, 2020, Plaintiff was moved from the H Block to the J Block, which is also on the West side of the prison.  (See Doc. No. 55 at 1.)

In his Petition, Plaintiff contends that the Policy "require[d] that the inmate be informed [in advance] that he must move or relinquish his job if his job is not on the side of the institution he currently lives on" and that "[a]ll inmates must be given the option and sign a form" (Doc. No. 16 at 2 (emphasis omitted)).  Plaintiff claims that he was neither given the option to relinquish his

current Work Assignment in order to remain living in the VHU nor any type of form to this effect. (See Doc. No. 22 at 3, 12; Doc. No. 55 at 4.)

### D.    Plaintiff's Work as a Certified Peer Support Specialist ("CPSS")

In January 2019, Plaintiff was assigned to work as a CPSS in the "Chapel East" and "Infirmary-POC-SOU." (See Doc. No. 22 at 15.)  Like the DTU, the POC is a "Level 5" housing unit. (Id. at 2.)  On January 9, 2019, Plaintiff started working full time as a CPSS. (See Doc No. 22 at 11, 12; Doc. No. 55 at 2.)  Plaintiff avers that his supervisor, Jaime Luquis, justified Plaintiff's transition to a full-time schedule by changing his Work Assignment to "DTU (Level 5)." (See id.) Plaintiff states that, despite this "job label," he has "never been scheduled for any work hours in the DTU" nor has he ever "stepped foot into the DTU building." (Doc. No. 22 at 2.  See also id. at 9; Doc. No. 54 at 1; Doc. No. 55 at 2.)  Rather, Plaintiff maintains that he has "worked on the East side [of the prison] for over a year." (Doc. No. 22 at 11.  See also Doc. No. 16 at 3; Doc. No. 54 at 12.)  He further asserts "that there are other CPSS workers with the same DTU job designation on their . . . work assignment file who also do not work in the DTU." (Doc. No. 32 at 1.)

Plaintiff's Work Assignment designation to the DTU is evidenced in several exhibits attached to his Declaration in Support of Petition. (See Doc. No. 22.)  In what appears to be a staff-wide email from Luquis dated January 9, 2019,[7] Plaintiff's "CPS Work Assignment" is listed as "B-Unit SRTU/DTU." (Id. at 15.)  Additionally, on October 9, 2020, Luquis confirmed in an email, attached as an exhibit to Defendants' October 12, 2020 Letter to the Court, "that effective

---

[7]  This exhibit contains a handwritten note that reads "switch you to full time CPS," which appears to confirm that in early January 2019, Luquis indeed switched Plaintiff to a full-time schedule. (See Doc. No. 22 at 15.)  At this time, however, Plaintiff was still assigned to work in the "Chapel East" and "Infirmary-POC-SOU" locations. (See id.)  According to Plaintiff, the "POC" is a "Level 5 housing unit." (Id. at 2.)

2/2/19, inmate Charles Zehring . . . was assigned as a CPS-DTU duties."  (Doc. No. 46, Ex. A at 1.)  In the October 9, 2020 email, Luquis further states that "[Plaintiff] was increased to 8 hours/day to cover the Level 5 Unit which includes the DTU" and "[h]is work hours were split between S-Unit, L-Unit and the DTU; on call as needed."  (Id.)

On April 10, 2019, Plaintiff's Work Assignment was changed from the Security Level 5 "Infirmary-POC-SOU" to the general population "P-Unit."  (See Doc. No. 22 at 2, 16.)  According to Plaintiff, that was the last time he worked in a "Level 5 housing unit."  (See id. at 2.)  Plaintiff states that "[o]n August 16, 2019, while living on E block," "[he] was assaulted from behind by a seriously mentally ill . . . inmate, William Gimbel[,]" who recognized Plaintiff from when he worked in the POC months prior.  (Doc. No. 22 at 2.  See also id. at 11.)  "[A]s far as Plaintiff knows," Gimbel "is still [living] in the DTU."  (Id. at 2.)  For this reason, Plaintiff opposes working in the POC and DTU, both Level 5 housing units located on the West side of the prison.  (See id. at 2, 9, 11; Doc. No. 55 at 2, 4.)

### E.      The Instant Litigation and Plaintiff's Housing Reassignment

As noted above, on September 18, 2019, Plaintiff was moved to the VHU, a "preferential unit" specifically for veteran inmates, situated in the "'S' block . . . on the East side of the prison." (Doc. No. 22 at 4, 11; Doc. No. 46 at 1.  See also Doc. No. 16 at 1.)  At this time, Plaintiff's Work Assignment included several East-side housing units.  (See Doc. No. 22 at 9, 11, 12.)

Over eight months later, on June 26, 2020, Plaintiff filed the Complaint against Defendants alleging various constitutional violations relating to the treatment of Plaintiff's medical needs while incarcerated.  (See Doc. No. 2.)  Twenty days later, on July 16, 2020, Plaintiff was informed that he was being relocated from the "'S' block, located on the East side of the prison, to the 'H' block, located on the West side of the prison."  (Doc. No. 46 at 1.  See also Doc. No. 16 at 2.)

Plaintiff originally characterized H Block as a "[l]evel 4 maximum security housing unit . . . with a predominance of youthful[,] behaviorally challenged offenders." (Doc. No. 16 at 2.) In a later filing on October 21, 2020, Plaintiff further explains that H Block "house[s] mostly actual level 3 (not level 2-3Y) and 4 prisoners and ha[s] a widely known reputation as the worst block in the facility. . . ." (Doc. No. 55 at 1.) Defendants submit that the "custody levels on both the 'S' block and the 'H' block are the same" in that they "hous[e] inmates of Custody Levels 3 and 4[,]" which includes Plaintiff, a "Custody Level 3 inmate." (Doc. No. 46 at 1.)

Additionally, Plaintiff claims that on July 16, 2020, while he was in the process of gathering his belongings to move, he received legal mail from the SCI Phoenix Security Office containing his "first correspondence from the Clerk of Courts regarding this civil action" (Doc. No. 16 at 3 (emphasis omitted)). He further states that "[t]he mail had been opened prior . . . and taped closed, hence opened and inspected outside [Plaintiff's] presence." (Doc. No. 22 at 19.)

### F.      Plaintiff's Petition for Temporary Restraining Order

On July 30, 2020, Plaintiff filed the instant Petition for Temporary Restraining Order (Doc. No. 16) against Defendants. Plaintiff argues that Defendants moved him to H Block in retaliation for filing the instant litigation and "numerous . . . administrative grievances" over his "decades of incarceration." (Doc. No. 16 at 1. See also Doc. No. 22 at 1.) The Petition states that Plaintiff recently heard "rumors" from fellow inmates who "over heard [prison] staff calling [P]laintiff a 'chronic complainer' and [stating] that the administration ha[d] grown weary of [his] complaints." (Doc. No. 16 at 2.)

Initially, Plaintiff sought an order from the Court requiring Defendants to move his housing back to the VHU and to refrain from retaliating against him for filing this action and any future administrative grievances. (See Doc. No. 16 at 1, 4.) He alternatively requested a hearing on the

9

matter.  (See id. at 4.)  In Plaintiff's most recent filing on October 21, 2020, he still requests a hearing.  (See Doc. No. 55 at 5-6.)  However, he now asks the Court to issue an injunction that "return[s] [P]laintiff to S unit, in a single cell, maintain[s] [P]laintiff's current employment status as a CPSS on the East side of the prison, and forbid[s] any further retaliation against [P]laintiff." (Id. at 6.)

On August 28, 2020, Defendants responded in opposition to Plaintiff's Petition.  (See Doc. No. 25.)  They argue that the Court should deny Plaintiff's request for an injunction because Plaintiff has failed to show a likelihood of success on the merits and that he will suffer irreparable harm if the Court denies his requested relief.  (See id. at 2.)

On October 7, 2020, the Court held a video conference hearing with Plaintiff and counsel for Defendants.  (See Doc. No. 41; Doc. No. 46 at 1.)  Following the video conference, the parties submitted to the Court additional filings.  (See Doc. Nos. 46, 50, 54, 55.)  As of Plaintiff's most recent filing dated October 21, 2020 (Doc. No. 55), he was still living on the West side of the prison but had been moved from H Block to a new housing unit on J Block.  (See id. at 1.)

### G.    Plaintiff's Exhaustion of the PA DOC Administrative Review Process

In his filings, Plaintiff submitted to the Court three administrative grievances pertaining to the instant litigation ("Grievance 88029"; "Grievance 880312"; and "Grievance 884922").  (See Doc. No. 22 at 6-7, 19-20; Doc. No. 54 at 4-5.)  Plaintiff also provided the Grievance Officers' initial responses, Supt. Sorber's responses to Plaintiff's appeals of the denial of the grievances, and Plaintiff's third-level appeals to the PA DOC Chief Grievance Officer.  (See Doc. No. 22 at 10-11, 22-23; Doc. No. 33 at 3-4, 5-6; Doc. No. 39 at 4-5; Doc. No. 54 at 6-12.)

Under Administrative Directive 804 ("DC-ADM 804"), which governs the "Official Inmate Grievance System" of the PA DOC, (see Doc. No. 25 at 10), "exhausti[on] . . . [of the]

grievance process requires inmates to complete three steps."  Hardy v. Shaikh, 959 F.3d 578, 582 (3d Cir. 2020).  "Inmates must first submit a written grievance to the Facility Grievance Coordinator and must then file two levels of appeals: first to the Facility Manager and then to the Secretary's Office of Inmate Grievances and Appeals."  Id.

On July 30, 2020, the date Plaintiff filed this Petition, he had begun the grievance process for two of the three grievances pertaining to this matter, Grievances 880299 and 880312, but had yet to complete all three of the required steps.  (See Doc. No. 22 at 6-7, 19-20.)  As of the date of this Opinion, Plaintiff has completed all required steps for the three grievances.  (See Doc. No. 22 at 10-11, 22-23; Doc. No. 33 at 3-4, 5-6; Doc. No. 39 at 4-5; Doc. No. 54 at 6-12.)

## III.    STANDARD OF REVIEW

The Petition for Temporary Restraining Order requests an injunction requiring Defendants to move Plaintiff to a "single cell" in the "S unit," "maintain [P]laintiff's current employment status as a CPSS on the East side of the prison, and forbid any further retaliation against [P]laintiff." (Doc. No. 55 at 6.)  In the alternative, Plaintiff requests a hearing on the matter.  (See id. at 5-6.) Plaintiff is proceeding pro se, and federal courts "tend to be flexible when applying procedural rules to pro se litigants[.]"  Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244 (3d Cir. 2013). Despite this "tradition of leniency[,]" "there are limits to [the Court's] procedural flexibility."  Id. at 244-45.

Notwithstanding Plaintiff's pro se status, the fact remains that "injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that [] [P]laintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citation omitted). See also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994) (stating the "extraordinary remedy" of injunctive relief "should be granted only in limited circumstances" (internal quotations omitted) (citation omitted)).  In order for this Court to

11

grant injunctive relief, Plaintiff must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20 (citations omitted).

If the first two "gateway factors" are satisfied, "a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017). "All four factors should favor preliminary relief before the injunction will issue." <u>S & R Corp. v. Jiffy Lube Int'l, Inc.</u>, 968 F.2d 371, 374 (3d Cir. 1992) (citation omitted). "Furthermore, a prisoner's request for injunctive relief must 'be viewed with great caution because of the 'intractable problems of prison administration.'" <u>Milhouse v. Fasciana</u>, 721 F. App'x 109, 111 (3d Cir. 2018) (citation omitted).

## IV.   ANALYSIS

The Petition will be denied because Plaintiff has failed to establish that he is likely to succeed on the merits of his Section 1983 claim and that he will suffer irreparable harm. Additionally, the balance of equities favors Defendants and an injunction would not serve the public interest.

### A.   Plaintiff Has Not Shown That He Is Likely to Succeed on the Merits of His Section 1983 Claim

At this stage of the litigation, Plaintiff has not shown that he is likely to prevail on the merits of his Section 1983 claim because he has failed to demonstrate that Defendants violated a federal right, privilege, or immunity, <u>see</u> 42 U.S.C. § 1983, and because the Court is without authority to direct the PA DOC to change Plaintiff's housing assignment.

The first step in analyzing a petition for a temporary restraining order is to consider whether the party seeking the relief requested is likely to succeed on the merits of the underlying claim, which, in this case, centers on civil liability of prison officials under § 1983.  § 1983 "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law."  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002) (citation omitted).  To establish a basis for relief under § 1983, Plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).

In his Petition, Plaintiff contends that Defendants moved Plaintiff to an undesirable housing unit in retaliation for the exercise of his First Amendment rights.  (See Doc. No. 16 at 1, 2, 3; Doc. No. 22 at 1, 2); see also Anderson v. Horn, No. 95-6582, 1997 U.S. Dist. LEXIS 3824, at *3 (E.D. Pa. Mar. 28, 1997) ("It is well established that, 'an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act when taken for different reasons, would have been proper.'" (citation omitted)).  The issue of state action is not before the Court, as Defendants neither raise nor oppose the presence of this element in their Memorandum of Law in Opposition to Plaintiff's Petition.  (See Doc. No. 25.)  Instead, Defendants argue that Plaintiff's claim fails on the merits because he has not shown that Defendants personally "deprived [him] of any right, privilege or immunity."  (Id. at 3.)

1.    **Plaintiff Has Not Established the Elements of a First Amendment Retaliation Claim**

Plaintiff has not made out a prima facie case of retaliation against Defendants at this time because he has failed to establish that he suffered an adverse action and the requisite causal connection between his protected activity and his transfer to H Block.  Moreover, Defendants have

shown that they would have transferred Plaintiff to the new housing even if he had not made use of the grievance process over the years or filed the instant action.

Plaintiff contends that Defendants retaliated against him for filing administrative grievances and the instant action by moving Plaintiff's housing from a "[l]evel 2-3 minimum-medium security housing unit" to "a [l]evel 4 maximum security . . . unit" that is "widely known . . . as the worst block in the facility."  (Doc. No. 16 at 1, 2; Doc. No. 55 at 1.)  Defendants counter this contention with the June 18, 2020 Policy Notice, which describes the implementation of a new policy (the "Policy") to move inmates' housing to "the same side of the institution [as] their work assignment."  (Doc. No. 39 at 3.  See also Doc. No. 46 at 1, 2.)

To establish a First Amendment retaliation claim, a prisoner must show: "(1) constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of constitutional rights and the adverse action."  DeFranco v. Wolfe, 387 F. App'x 147, 154 (3d Cir. 2010) (citations omitted).  The parties dispute the adverse action and causal link elements.

### a.      Plaintiff's Filing of Administrative Grievances and the Complaint Is Constitutionally Protected Conduct

First, a prisoner alleging retaliation must show that he engaged in "constitutionally protected conduct."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (citing Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)).  For purposes of Plaintiff's Petition, Defendants concede that "filing grievances constitutes [constitutionally] protected conduct."  (Doc. No. 25 at 6.)  Indeed, the Third Circuit Court of Appeals has held that, in addition to commencing a judicial proceeding, "the filing of prison grievances is a constitutionally protected activity."  Robinson v. Taylor, 204

F. App'x 155, 157 (3d Cir. 2006).  See also Mitchell, 318 F.3d at 530 (explaining that the filing of

a prison grievance "implicates conduct protected by the First Amendment").

In this case, Plaintiff engaged in constitutionally protected conduct by filing "numerous

good faith administrative grievances concerning a host of issues[]" over his "decades of

incarceration." (Doc. No. 16 at 2.)  Additionally, on June 26, 2020, Plaintiff commenced the instant

action in this Court by filing the Complaint (Doc. No. 2) alleging constitutional violations relating

to his medical treatment while incarcerated.  Thus, Plaintiff has established the first prong of his

retaliation claim.

### b.    Plaintiff Has Failed to Allege an Adverse Action with Sufficient Particularity

Second, a prisoner must show that he suffered "some 'adverse action' at the hands of prison

officials."  Rauser, 241 F.3d at 333 (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).

"An adverse action is one 'sufficient to deter a person of ordinary firmness from exercising his

First Amendment rights.'"  Watson v. Rozum, 834 F.3d 417, 422 n.6 (3d Cir. 2016) (quoting Allah,

229 F.3d at 225).  Whether a particular action taken by prison officials would "deter a person of

ordinary firmness from exercising" his constitutional rights "depend[s] on the facts of the

particular case."  Allah, 229 F.3d at 225, 226 (internal quotation omitted) (citation omitted).

To establish this element, Plaintiff avers that he was transferred from a "privileged"

housing unit with special programming to assist veteran inmates "during their incarceration and

release from . . . prison" to a "maximum security" unit, which "ha[s] a widely known reputation

as the worst block in the facility." (Doc. No. 16 at 1, 3; Doc. No. 55 at 1.  See also Doc. No. 22 at

4.)  He further describes the H Block as a "[l]evel 4 unit comprised of severely behaviorally

challenged inmates who are . . . often assaultive and receive . . . disciplinary infractions[.]"  (Doc.

No. 22 at 4.)  Plaintiff speculates that his "presence on this unit substantially raises the odds of

hi[m] being assaulted again, extorted, or otherwise harmed due to his age, medical infirmities, and behavioral disposition."  (Id.)

Defendants submit that Plaintiff cannot establish this element because "the transfer of Plaintiff's housing assignment and custody level" is not sufficiently adverse "for the purpose of a prison retaliation claim."  (Doc. No. 25 at 6.)  See Verbanik v. Harlow, 512 F. App'x 120, 122-23 (3d Cir. 2013) (transfer to a less desirous cell and being locked in the shower for two hours on one occasion not an adverse act); see also Fortune, 2013 Pa. Commw. Unpub. LEXIS 493, at *2-3 (stating that officials' "discretionary decisions" about an inmate's custody status, housing unit, and participation in vocational programs "do not qualify as adverse actions for purposes of Section 1983").

Moreover, Defendants aver that the custody levels of both the S Block in which the VHU is located and the H Block are "the same" in that they "hous[e] inmates of Custody Levels 3 and 4."  (Doc. No. 46 at 1.)  Under DC-ADM 804, Custody Levels "two to four pertain[] to general population inmates."  Coleman, 2019 U.S. Dist. LEXIS 120719, at *5.  As a "Custody Level 3" inmate (Doc. No. 46 at 1), Plaintiff's transfer to a general population housing unit comprised of Custody Level 3 and 4 inmates is not sufficiently adverse "to deter a person of ordinary firmness from exercising his . . . rights."  Allah, 229 F.3d at 225 (internal quotations omitted) (citation omitted).  See, e.g., Verbanik, 512 F. App'x at 122-23.  Thus, regarding the transfer, Plaintiff has failed to establish an adverse action or the second prong of his retaliation claim based on his transfer to H Block.

Plaintiff also alleges that Defendants "opened and inspected [Plaintiff's legal mail] outside [his] presence" in retaliation for the exercise of his First Amendment rights.  (Doc. No. 22 at 19. See also Doc. No. 16 at 3.)  However, it is unlikely that a single alleged instance of opening and

inspecting an inmate's legal mail outside his presence would amount to an action sufficient to "deter a person of ordinary firmness from exercising" their rights.  Allah, 229 F.3d at 225 (internal quotations omitted) (citation omitted).  See also Schreane v. Holt, 482 F. App'x 674, 676-77 (3d Cir. 2012) (While "[p]risoners may establish a [First Amendment] violation . . . where there is a pattern and practice of opening properly marked incoming legal mail outside the prisoner's presence[] . . . a single instance of opening [legal] mail outside an inmate's presence does not rise to the level of a constitutional deprivation." (citations omitted)); Rivera v. Chester Cnty., No. 15-5609, 2017 U.S. Dist. LEXIS 45755, at *76-77 (E.D. Pa. Mar. 28, 2017) ("A single temporary inconvenience does not qualify as adverse." (citations omitted)).  Thus, Plaintiff has also failed to establish an adverse action or the second prong of his retaliation claim based on the alleged opening and inspection of his legal mail outside of his presence on one occasion.

Even if the Court were to assume, arguendo, that Plaintiff's transfer to H Block and opening of his legal mail constituted an adverse action, his Section 1983 claim is still unlikely to succeed on the merits because Plaintiff has failed to demonstrate at this stage a causal link between his constitutionally protected conduct and the alleged retaliatory acts.

### c.    Plaintiff Has Not Established the Requisite Causal Connection Between His Conduct and the Alleged Adverse Action

Third, to prevail on a retaliation claim, a plaintiff must demonstrate a causal link between his constitutionally protected conduct and the adverse action by prison officials.  See Rauser, 241 F.3d at 333.  To do so, the prisoner must prove that his protected activity was a "substantial or motivating factor" in the adverse action taken.  Id. (internal quotation and citation omitted).  Once he does so, "the burden then shifts to the prison official to prove that the same decision would have been made absent the protected conduct for reasons reasonably related to a legitimate penological interest."  DeFranco, 387 F. App'x at 154-55 (citing Rauser, 241 F.3d at 334).

17

   **i.  Plaintiff Has Not Shown an "Unusually Suggestive Temporal Proximity" or Any Other Evidence of a Retaliatory Motive**

"[A] plaintiff may rely upon a broad array of evidence" to establish that his protected conduct was a "substantial or motivating factor" in the adverse action taken. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283-84 (3d Cir. 2000). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). "If neither of these showings is made, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation." DeFranco, 387 F. App'x at 154 (citing DeFlaminis, 480 F.3d at 267).

"To demonstrate a causal connection, a plaintiff bears the burden of pointing to something in the record beyond his pure speculation." Tapp v. Brazil, No. 11-677, 2014 WL 2587026, at *11 (E.D. Pa. June 9, 2014) (citations omitted). "A plaintiff must come forward with more than 'general attacks' upon the defendants' motivations and must produce 'affirmative evidence' of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive." Brooks v. DiGuglielmo, No. 05-4588, 2008 WL 5187529, at *12 (E.D. Pa. Dec. 9, 2008) (citation omitted). The Third Circuit has warned courts to "be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." DeFlaminis, 480 F.3d at 267.

Plaintiff has failed to establish an unusually suggestive temporal proximity between his protected activities and his July 16, 2020 relocation to H Block on the West side of the prison. He

contends that Defendants moved his housing assignment in retaliation for filing "numerous good faith administrative grievances" over his "decades of incarceration" and for bringing the instant action.  (Doc. No. 16 at 2.  See also Doc. No. 22 at 1.)  On June 26, 2020, Plaintiff filed the Complaint in this case.  (See Doc. No. 2.)  Twenty days later, Plaintiff was moved from the VHU to H Block.  (See Doc. No. 16 at 2.)  That same day, Plaintiff received mail concerning the instant action that had been "opened and inspected outside [his] presence."  (Doc. No. 22 at 19.)

Plaintiff has failed to establish any temporal connection between his use of the grievance process and his move to H Block.  In his filings, Plaintiff does not provide the dates or substance of any administrative grievance dated prior to his July 16, 2020 move.  He simply refers to "numerous . . . grievances concerning a host of issues," "100%" of which the "system" found to be "non-frivolous."  (Doc. No. 16 at 2.)  Absent a specific date of any grievance filed prior to Plaintiff's reassignment to H Block, a temporal connection does not exist and therefore cannot be established.  See Cooper v. Pa. Dep't of Corr., 756 F. App'x 130, 134 (3d Cir. 2018) (concluding that inmate failed to show a causal link where he asserted that "he raised complaints about [a corrections officer] multiple times throughout 2011, but provided no greater specificity concerning the timing of those complaints.").

Additionally, the three Grievances that Plaintiff did submit in this case cannot serve as the basis for the alleged retaliatory act, as they are all dated after Plaintiff was moved to H Block on July 16, 2020.  In Grievance 880312, dated July 17, 2020, Plaintiff addresses the issue of his "legal mail" being "opened and inspected outside [his] presence."  (Doc. No. 22 at 19.)  In Grievance 880299, dated July 18, 2020, Plaintiff alleges the same arguments of retaliation that he asserts in the instant Petition.  (See id. at 6-7.)  In Grievance 884922, dated July 31, 2020, Plaintiff alleges that Jaime Luquis negligently failed to rectify or otherwise respond to the alleged discrepancy

between Plaintiff's DTU Work Assignment and actual work schedule. (See Doc. No. 54 at 4-5.) This protected conduct occurred after Plaintiff was moved to H Block, as all three grievances were filed after July 16, 2020. Thus, there is no temporal proximity between Plaintiff's filing of these grievances and the alleged retaliatory move.

Plaintiff has also failed to prove an "unusually suggestive" temporal proximity between the filing of his Complaint and his housing reassignment. "When showing causation through unusually suggestive timing, the contemplated temporal proximity must be 'on the order of days or weeks.'" Singleton v. Shearer, No. 17-1027, 2019 WL 3337060, at *6 (M.D. Pa. July 25, 2019) (quoting Rink v. Northeastern Educ. Intermediate Unit, 717 F. App'x 126, 134 (3d Cir. 2017) (citations omitted)). Although Plaintiff was moved out of the VHU twenty days after he commenced this suit, Defendants appear to have been in the process of implementing the housing Policy eight days before Plaintiff filed his Complaint. In the Policy Notice from the "Office of the Superintendent" dated June 18, 2020—8 days before Plaintiff filed his Complaint—Supt. Sorber informed SCI Phoenix staff and inmates that the institution "is in the process of implementing housing individuals on the same side of the institution [as] their work assignment." (Doc. No. 39 at 3.) She also provided that if inmates "decide[] not to move to their new housing location they will be permitted to remain in their current housing but will forfeit their current work assignment." (Id.)

Plaintiff contends that under the Policy, Defendants were obligated to notify inmates of the option to forego their work assignment and remain in their current housing unit or maintain their work assignment and relocate elsewhere. (See Doc. No. 22 at 3; Doc. No. 55 at 4.) He adds that Defendants were also required to provide inmates with a form for their signature concerning this decision. (See Doc. No. 22 at 3.) Plaintiff states that prior to his forced move on July 16, 2020,

he neither received notice of the option to forego his CPSS Work Assignment in order to remain living in the VHU nor a form for his completion.  (See id. at 4; Doc. No. 55 at 4.)

The June 18, 2020 Policy Notice controls this issue.  (See Doc. No. 39 at 3.)  It is dated 20 days prior to Plaintiff's relocation to H Block.  (See id.)  The words "NOTICE TO INMATES" appear at the top of the page in bold, capital letters and the subject line reads "Same Side Work/Housing."  (Id.)  The bottom of the page shows that it was circulated to prison staff, managers, and three separate units, including an addressee labeled "Housing Units – Bulletin Boards."  (Id.)  It also includes the following instruction: "Housing Unit Bulletin Boards (2 per Block) – PLEASE POST."  (Id.)  Thus, it appears from the face of the Policy Notice that it was posted on the bulletin boards in each housing unit at the prison.

In the body of the Policy Notice, Supt. Sorber's office clearly states that "if an individual decides not to move to their new housing location [,] they will be permitted to remain in their current housing but will forfeit their current work assignment."  (Doc. No. 39 at 3.)  Based on the language of the Policy Notice and its apparent posting in the housing units one month before Plaintiff's move to H Block, Plaintiff's argument that he lacked prior notice of the Policy and his option to remain living in the VHU seems unavailing.  Moreover, nothing in the Policy Notice or the record indicates that Defendants were under any obligation to provide inmates with notice and a form.

Neither has Plaintiff demonstrated "a pattern of antagonism coupled with timing to establish a causal link."  DeFlaminis, 480 F.3d at 267 (citations omitted).  "[W]here the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'"  Watson, 834 F.3d at 424 (internal quotations omitted) (citation omitted).

Plaintiff contends that:

> [Defendants'] antagonistic refusal to actually investigate and acknowledge the facts as they exist in their reaction to [P]laintiff's in person complaints, written requests, and grievances demonstrates a continuing surrounding pattern . . . that is "unusually suggestive" of a retaliatory motive towards [P]laintiff in itself, which[,] in conjunction with the temporal proximity of the adverse action in the first place, supports an inference of causation

(Doc. No. 22 at 3 (citations omitted)).  He further asserts that "other CPSS workers with the same DTU" Work Assignment "who also do not [actually] work in the DTU, some of whom also live on the East side of the prison[,]" (Doc. No. 32 at 1), "are not being subjected to this treatment, nor are they being forced to give up their jobs to remain on the unit." (Doc. No. 55 at 4.)[8]

Although Plaintiff was moved twenty days after filing his July 26, 2020 Complaint, his timing evidence is severely weakened by the June 18 Policy Notice that demonstrates Defendants' implementation of the Policy prior to the commencement of this action.  See Blakney v. City of Philadelphia, 559 F. App'x 183, 186 (3d Cir. 2014) ("We measure temporal proximity from the date on which the litigant first files a complaint." (citation omitted)).

Moreover, Plaintiff's "plus" evidence consists primarily of Defendants' denial of the three grievances Plaintiff filed after his move, the assertion that other CPSS workers with a DTU Work Assignment were permitted to remain living on the East side of the prison, and an alleged "rumor" that inmates heard prison staff complaining about Plaintiff.  Plaintiff's two vague allegations concerning an unsubstantiated "rumor" among unnamed prison staff and the differential treatment of other CPSS workers are not sufficient to demonstrate a "pattern of antagonism."  See Robinson v. Southeastern Pa. Transp. Auth., Red Arrow Div., 982 F.2d 892, 895 (3d Cir. 1993) (concluding that there was sufficient evidence to support district court's finding of a causal link based on a

---

[8]   Plaintiff also asserts that Defendants' "inconsistent" and "shifting justifications" for his new housing assignment are further evidence of a pattern of antagonism.  (Doc. No. 32 at 1.)  The Court addresses this argument seriatim.  See discussion, infra, Section A(1)(c)(ii).

pattern of antagonism where employer subjected employee to "pattern of harass[ment] . . . by repeatedly disciplining him for minor matters, miscalculating his points for absences from work, and generally trying to provoke [him] to insubordination."). Nor does the administration's denial of Plaintiff's grievances establish this "pattern," as Plaintiff's assertions show only that prison staff resolved his complaints in a manner unfavorable to him and he was displeased with this outcome.

Finally, Plaintiff has not "show[n] that, from the evidence in the record as a whole, the trier of fact should infer causation." DeFranco, 387 F. App'x at 154 (citation omitted). The record reveals one alleged instance of opening Plaintiff's legal mail outside of his presence, multiple denials of grievances by SCI Phoenix staff for legitimate administrative reasons, and one allegation that Plaintiff heard "rumors" from fellow inmates who "over heard [prison] staff calling [him] a 'chronic complainer' and [stating] that the administration has grown weary of his complaints." (Doc. No. 16 at 2.) These bare assertions, taken together, do not support an inference of causation required for retaliation. See Brooks, 2008 WL 5187529, at *12 ("A plaintiff must come forward with more than 'general attacks' upon the defendants' motivations and must produce 'affirmative evidence' of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive.").

### ii. Defendants Have Presented a Legitimate Penological Justification for the Policy

Even if Plaintiff had shown that his protected conduct was a substantial, motivating factor in his housing reassignment, Defendants have met their burden of proving that they would have moved Plaintiff absent his protected conduct for a legitimate penological reason.

"[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably

related to a legitimate penological interest." Rauser, 241 F.3d at 334. See also Turner v. Safley, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). "This is a 'deferential standard' meant to take into account 'that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials . . . who possess the necessary expertise.'" DeFranco, 387 F. App'x at 155 (quoting Rauser, 241 F.3d at 334).

Here, Plaintiff argues that he believes Defendants' "'job' label rationale was just a pretext for the actual retaliation that was occurring for [his] filing [of] grievances" and the instant lawsuit, (Doc. No. 16 at 3), because Plaintiff "never actually worked in this [DTU] assignment," (Doc. No. 22 at 3). He asserts that Defendants have provided "shifting" and "alternate justifications" throughout the litigation, which is further evidence that supports an inference of antagonism. (Doc. No. 32 at 1; Doc. No. 33 at 1. See also Doc. No. 22 at 3-4.)

Defendants have asserted a legitimate penological justification for the Policy at issue. In an August 4, 2020 response to Grievance 880299, filed by Plaintiff on July 18, 2020, Officer Clark explained that Plaintiff's housing was "moved [] to where [he] [was] employed to eliminate the crossover of the institution." (Doc. No. 22 at 10.) In the September 8, 2020 revised response to this grievance, the Officer stated that "[t]he facility has the right to house any general population inmate on any general population unit to facilitate operational needs." (Doc. No. 33 at 4.) In Supt. Sorber's September 18, 2020 response to Plaintiff's appeal of Grievance 880299, she further explained that "[h]ousing unit moves or cell moves are made in accordance with operational needs of the facility." (Doc. No. 39 at 4.) Moreover, in Defendants' October 12, 2020 Letter to the Court, they state that the "expansive" housing reassignments of "several hundred inmate[s]" was implemented "for security purposes." (Doc. No. 46 at 1.)

Plaintiff argues that these "shifting" and "alternate justifications" are further evidence that supports an inference of antagonism, (Doc. No. 32 at 1; Doc. No. 33 at 1), and "[D]efendants . . . cannot be permitted to maintain counterfactual claims as a legitimate rational[e] for their actions," (Doc. No. 22 at 3).  Plaintiff's argument must fail, however, as the justifications advanced by Defendants are essentially identical in nature.  Moving inmates' housing to "eliminate the cross-over of the institution" falls squarely within the right of the facility "to house any general population inmate on any general population unit to facilitate operational needs"—namely "for security purposes." (Doc. No. 22 at 10; Doc. No. 33 at 4; Doc. No. 46 at 1.)  Moreover, reassigning inmates' housing to manage the operational and security needs of a facility is plainly a legitimate penological interest.  See Bell v. Wolfish, 441 U.S. 520, 546 (1979) (stating that "the effective management of [a] detention facility . . . is a valid objective"); Abdul-Akbar v. Dep't of Corr., 910 F. Supp. 986, 1000-01 (D. Del. 1995) (citing "preserving institutional order and discipline" as "legitimate penological goals").

Thus, Defendants' justifications are legitimate penological objectives to be left to the sound discretion of prison officials who have the "necessary expertise" in dealing with the "difficult" "task of prison administration."   DeFranco, 387 F. App'x at 155 (internal quotations omitted) (citing Rauser, 241 F.3d at 334).  See also Hester v. Phelps, No. 12-001, 2014 WL 4955262, at *2 (D. Del. Sept. 30, 2014) ("'[M]aintaining institutional security and preserving internal order and discipline' are the central goals of prison administration." (quoting Bell, 441 U.S. at 546)); Robinson v. Wetzel, No. 11-2194, 2014 WL 11456082, at *8 (M.D. Pa. June 25, 2014) ("When analyzing a retaliation claim, courts are to bear in mind that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, *particularly where prison security* is concerned." (emphasis added) (citation omitted)).

### 2. The Court Lacks the Authority to Order Plaintiff's Requested Relief

Plaintiff is unlikely to prevail on the merits of his Section 1983 claim because the Court has no authority to direct the PA DOC to change Plaintiff's housing assignment.

The constitutional rights of prison inmates are necessarily "subject to restrictions and limitations." Bell, 441 U.S. at 545. "The fact of confinement as well as the legitimate goals and policies of the penal institution limit[] these retained constitutional rights." Id. at 546 (citations omitted). The U.S. Supreme Court has stated that, in order to maintain institutional security and preserve internal order and discipline,

> Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

Id. at 546-47 (citations omitted). In dealing with the challenging problems "that arise in the day-to-day operation of a corrections facility . . . [p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve" the "central objective[s]" of prison administration. Id. at 547 (citations omitted).

"Neither the Due Process Clause nor the laws of Pennsylvania give a convict a protected liberty interest in remaining in any particular housing status, in any particular state prison, or in any particular housing area within a state prison." Nichelson v. Redwine, No. 99-1769, 2000 U.S. Dist. LEXIS 15654, at *5 (E.D. Pa. Oct. 26, 2000). "The Supreme Court has consistently held that a convict does not have a Fourteenth Amendment liberty interest in a particular housing location or custody level while under the jurisdiction of correctional authorities." Id. at *5-6 (citations omitted). Additionally, under Pennsylvania law, "[a]n inmate does not have a right to be housed

26

in a particular facility." 37 Pa. Code § 93.11(a).  See also Johnson v. Hill, 910 F. Supp. 218, 220 (E.D. Pa. 1996) ("[A]bsent a state-created liberty interest[,] [which] does not exist in Pennsylvania, prisoner placement is a matter of prison administration." (citation omitted)).

From the foregoing principles, it follows that "[p]rison officials have discretion to house inmates at the facilities they choose. . . . [and] the Court has no authority to dictate where [p]laintiff is housed." Hester, 2014 WL 4955262, at *2.  "This determination is made by prison authorities as part of the administration of the prison." Id.  See also Fletcher v. Phelps, No. 12-489, 2012 U.S. Dist. LEXIS 108291, at *18-19 (D. Del. 2012) (stating an inmate's "request for injunctive relief in the form of a transfer and classification change seeks relief on issues outside the purview of the court[,]" as "[it] has no authority to dictate plaintiffs housing assignment or prison classification"); United States v. Janiec, 505 F.2d 983, 987 (3d Cir. 1974) (At the institutional-level, "a federal court has no authority to designate a 'place of confinement.'").  In addition, "courts lack any control over what, if any, . . . programs a defendant may participate in." United States v. Schonewolf, 905 F.3d 683, 690 (3d Cir. 2018).  See also Fortune, 2013 Pa. Commw. Unpub. LEXIS 493, at *14 (citation omitted) (stating that an inmate's custody status, housing unit, and admission in a vocational program is "within the discretion of prison officials and there is no constitutional right to it").

Plaintiff seeks an injunction ordering Defendants to move him to a "single cell" in the "S unit" and "maintain his current employment as a CPSS on the East side of the prison." [9]  (Doc. No. 55 at 6.)  As demonstrated, absent evidence that Defendants deprived Plaintiff of a federal right,

---

[9]  Plaintiff also asks the Court to prohibit Defendants from any further retaliation against him. (See Doc. No. 16 at 4; Doc. No. 55 at 6.)  However, as discussed in this Opinion, Plaintiff has not established a retaliation claim against Defendants.  Thus, there is no further retaliation by Defendants for the Court to proscribe.

privilege, or immunity, <u>see</u> § 1983, the Court lacks the authority to direct the PA DOC to change Plaintiff's housing unit and CPSS Work Assignments.  <u>See</u> <u>Johnson</u>, 910 F. Supp. at 220; <u>Hester</u>, 2014 WL 4955262, at *2; <u>Fletcher</u>, 2012 U.S. Dist. LEXIS 108291, at *18-19; <u>Schonewolf</u>, 905 F.3d at 690; <u>Fortune</u>, 2013 Pa. Commw. Unpub. LEXIS 493, at *2-3.  Thus, Plaintiff's Section 1983 claim is unlikely to succeed on the merits.

### 3. Plaintiff Has Not Satisfied the Administrative Exhaustion Requirement

Finally, Plaintiff is unlikely to succeed on the merits of his Section 1983 claim because he failed to exhaust his administrative remedies prior to filing the instant Petition.

Plaintiff cannot succeed on the merits of his claim if he has not satisfied the Prison Litigation Reform Act's ("PLRA") exhaustion requirement.  <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 81 (2006) (The PLRA "requires a prisoner to exhaust any available administrative remedies *before* [bringing any suit] challenging prison conditions in federal court." (emphasis added)); <u>see</u> <u>also</u> <u>Downey v. Pa. Dep't of Corr.</u>, 968 F.3d 299, 304-05 (3d Cir. 2020) ("Exhaustion is a threshold requirement that district courts must consider." (citations omitted)).   The PLRA exhaustion provision provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'"  <u>Downey</u>, 968 F.3d at 305 (quoting <u>Woodford</u>, 548 U.S. at 88).  "These procedural rules are supplied by the individual prisons."  <u>Id.</u> (citations omitted).  "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007).  <u>See</u> <u>also</u> <u>Spruill v. Gillis</u>, 372

F.3d 218, 222 (2004) (holding that "the determination whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances").

Administrative Directive 804 ("DC-ADM 804") governs the "Official Inmate Grievance System" at SCI Phoenix.  (See Doc. No. 25 at 10.)  Upon entering PA DOC custody, each inmate is issued an Inmate Handbook that "sets forth the relevant procedures for inmates to file a grievance." Downey, 968 F.3d at 305.  DC-ADM 804 sets forth a three-step exhaustion process, which requires "[i]nmates [to] first submit a written grievance to the Facility Grievance Coordinator and . . . then file two levels of appeals: first to the Facility Manager and then to the Secretary's Office of Inmate Grievances and Appeals." Hardy, 959 F.3d at 582.  The Third Circuit recently delineated the three-tier grievance process of the PA DOC:

> Inmates are required to file a form, describing the incident, within fifteen working days to the Facility Grievance Coordinator, who generally must respond in fifteen working days.  If the prisoner receives an unfavorable response, he or she must then file an appeal to the Facility Manager within fifteen working days.  If the grievance is again denied, the inmate has fifteen working days from the date of the Facility Manager's decision to appeal to the Secretary's Office of Inmate Grievances and Appeals for final review.  The Secretary's Office must respond within thirty working days. In its entirety, the grievance process can take upwards of five months.

Downey, 968 F.3d at 305-06.

Here, Plaintiff "requests the Court [to] use its discretion permitting relief pending exhaustion."  (Doc. No. 32 at 1.)  Defendants counter that Plaintiff, by filing his Petition before completing all three steps of the grievance process, failed to properly exhaust his administrative

remedies and as a result, he cannot succeed on the merits of his claims.[10]  (See Doc. No. 25 at 10-11, 12.)

Defendants are correct that the PLRA "prohibits an inmate from bringing a civil rights suit alleging specific acts of unconstitutional conduct by prison officials '*until* such administrative remedies as are available are exhausted.'"  Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (quoting 42 U.S.C. § 1997e(a)) (emphasis in original).  "To satisfy this requirement, a prisoner must exhaust all available administrative remedies *prior* to filing suit."  Id. (emphasis added) (citations omitted).  See also Woodford, 548 U.S. at 88 (To properly exhaust, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to brin[g]ing suit in federal court.").

On July 17, 2020, Plaintiff filed Grievance 880312 with the administration at SCI Phoenix. (See Doc. No. 22 at 19-20.)  The very next day, he filed Grievance 88029.  (See id. at 6-7.)  Twelve days later, on July 30, 2020, Plaintiff filed the instant Petition.  (See Doc. No. 16.)  Thus, as of the date of this Petition, Plaintiff had only completed the first step of the grievance process for Grievances 88029 and 880312.  (See Doc. No. 22 at 6-7, 19-20.)

On July 31, 2020, the day after Plaintiff submitted his Petition, he filed Grievance 884922. (See Doc. No. 54 at 4-5.)  Accordingly, when Plaintiff filed this Petition, he had yet to fully exhaust

---

[10]  Defendants specifically argue that Plaintiff's claims are unsuccessful on the merits because he failed to assert that "he has exhausted his administrative remedies prior to filing this [Petition]." (Doc. No. 25 at 11.)  While "there is no question that exhaustion is mandatory under the PLRA," the Supreme Court has held that "[f]ailure to exhaust is an affirmative defense . . . and inmates are not required to specially plead or demonstrate exhaustion in their complaints."  Jones v. Bock, 549 U.S. 199-200, 216 (2007).  See also Small v. Camden Cnty., 728 F.3d 265, 268-69 (3d Cir. 2013) ("Failure to exhaust is an affirmative defense the defendant must plead and prove; it is not a pleading requirement for the prisoner-plaintiff.").  Though Plaintiff is not required to plead that he exhausted his administrative remedies, his claims still fail because he has not done so.

the three-step grievance process for the three grievances submitted in support of his request for a temporary restraining order.  (See Doc. No. 22 at 6-7, 19-20; Doc. No. 54 at 4-5.)

Plaintiff concedes that as of the filing of his Petition, he had not completed the three-step exhaustion process.  (See Doc. No. 32 at 1.)  Although Plaintiff has now completed all required steps for the three grievances, the completion does not cure his initial failure to exhaust his administrative remedies before filing the instant Petition.  See Oriakhi,165 F. App'x at 993 ("The fact that [Plaintiff] completed the administrative review process before the District Court reached the exhaustion question is of no consequence.").  "Indeed, there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court."  Id. (citing Johnson v. Jones, 340 F.3d 624, 627–28 (8th Cir. 2003) (collecting cases and holding that "the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred")).  Thus, absent an exception to the exhaustion requirement, Plaintiff's Section 1983 claim is unlikely to succeed on the merits because he filed his Petition before properly exhausting all of his "available" administrative remedies.  See § 1997e(a).

### B.    Denying Plaintiff's Requested Relief is Unlikely to Cause Irreparable Harm

The Petition also will be denied because Plaintiff is unlikely to suffer irreparable harm in the absence of his requested relief.  To obtain an injunction, Plaintiff must demonstrate that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief."  Reilly, 858 F.3d at 179.

Defendants correctly point out that in the prison litigation context, injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).  "The preliminary injunction must be the only way of protecting the plaintiff from

harm." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989) (citations omitted).

In the Third Circuit, "[t]he relevant inquiry is whether [Plaintiff] is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985). A party seeking injunctive relief "must make a 'clear showing of *immediate* irreparable harm.'" Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original) (citation omitted). A showing that irreparable harm "will occur only in the indefinite future" is "insufficient." Id. "The irreparable harm alleged must be actual and imminent, not merely speculative." Moneyham v. Ebbert, 723 F. App'x 89, 92 (3d Cir. 2018). See also Manganaro v. InteropTec Corp., 874 F. Supp. 660, 662 (E.D. Pa. 1995) ("Showing a risk of mere irreparable harm is not enough to warrant injunctive relief.").

Plaintiff fails to make a clear showing of immediate irreparable harm and that a temporary restraining order or a preliminary injunction is the only way to protect him from that harm. Plaintiff asserts he will suffer irreparable harm if the Court does not order Defendants to move him back to S Block because his current housing in a "[l]evel 4 maximum security housing unit" with "youthful, behaviorally-challenged offenders" "substantially raises the odds of hi[m] being assaulted again, extorted, or otherwise harmed due to his age, medical infirmities, and behavioral disposition." (Doc. No. 16 at 2; Doc. No. 22 at 4.) Plaintiff further avers that living on the West side of the prison places him at risk of being assaulted because "as far as Plaintiff knows," the "mentally ill" inmate, Gimbel, who attacked Plaintiff in August 2019, "is still [living] in the DTU" located on the West side. (Doc. No. 22 at 2. See also Doc. No. 46 at 1.)

Plaintiff's allegation that his current housing assignment places him at a risk of being attacked at some uncertain point in the future is too "speculative" to warrant injunctive relief. See

<u>Moneyham</u>, 723 F. App'x at 92.  Plaintiff is unsure whether Gimbel even lives in the West-side DTU, as he states only that "as far as [he] knows," he is still there.  (Doc. No. 22 at 2.)  Moreover, there are a total of eight housing units on the West side at SCI Phoenix and Plaintiff fails to specify any sort of proximity between his current J Block housing unit and the Security Level 5 DTU.  <u>See</u> PA.GOV, <u>SCI Phoenix</u>, PA. DEP'T OF CORR., https://www.cor.pa.gov/Facilities/StatePrisons/Pages/Phoenix.aspx. The possibility of a dangerous encounter with one out of approximately 2,800 inmates currently housed at SCI Phoenix is a "speculative" allegation of harm that may "occur only in the indefinite future."  <u>Moneyham</u>, 723 F. App'x at 92; <u>Campbell Soup Co.</u>, 977 F.2d at 91.  <u>See also</u> <u>Monthly Institutional Profile</u>, PA. DEP'T OF CORR. (Oct. 31, 2020), https://www.cor.pa.gov/About%20Us/Statistics/Documents/Current%20Monthly%20Profile.pdf

Furthermore, a preliminary injunction is not "the only way of protecting the plaintiff from harm[,]" <u>Instant Air Freight Co.</u>, 882 F.2d at 801, as Defendants submit that "Plaintiff may contact his Unit Manager or the Facility Security Office should he ever feel threatened or pressured in any way."  (Doc. No. 46 at 2.)  Therefore, Plaintiff has not shown that he is likely to suffer immediate irreparable harm if the Court denies his request for a preliminary injunction.

### C.   Plaintiff Has Failed to Establish that the Balance of Equities Tip in His Favor

Plaintiff has failed to show that an injunction requiring Defendants to change his housing assignment will not cause even greater harm to Defendants.  After determining whether Plaintiff established the first two "gateway factors," warranting injunctive relief, <u>Reilly</u>, 858 F.3d at 179, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 542 (1987).  Stated otherwise, Plaintiff must show that "granting preliminary relief

will [not] result in even greater harm to the nonmoving party."  <u>SI Handling Sys., Inc.</u>, 753 F.2d at 1254-55 (citations omitted).

Here, Plaintiff has not shown that requiring Defendants to change his housing assignment will not result in a significant administrative impairment to SCI Phoenix staff.  Moreover, much of Plaintiff's evidence underlying his claimed injury of being relocated to the West side of the prison consists of the disfavored conditions at H Block.  (<u>See</u> Doc. No. 16 at 2; Doc. No. 55 at 1.) As of October 21, 2020, Plaintiff had been moved off H Block to a new housing unit on J Block. (<u>See</u> Doc. No. 55 at 1.)  Therefore, Plaintiff no longer resides in "the worst block in the facility." (<u>Id.</u>)

Thus, Plaintiff has not shown that his injury outweighs the administrative burden placed upon Defendants should the Court grant the injunction.

### D.    Plaintiff's Requested Relief is Not in the Public Interest

Nor would a preliminary injunction ordering Defendants to move Plaintiff's housing serve the public interest.  "As a preliminary matter, the Court notes that the public interest is best served if the courts do not get involved in the daily operations of a prison, particularly prior to a finding that the Constitution has been violated."  <u>Blackstone v. Thompson</u>, No. 12-899, 2013 U.S. Dist. LEXIS 139040, at *3 (W.D. Pa. Sept. 27, 2013).

Because the Court has determined that Plaintiff's Section 1983 claim based on alleged unconstitutional retaliation by Defendants is unlikely to prevail on the merits, the public interest would be best served if the Court refrains from ordering the requested relief and thereby inserting itself into the daily operations of SCI Phoenix.

## V.    CONCLUSION

Injunctive relief is "an extraordinary remedy[,]" and Plaintiff has failed to satisfy any of the required elements to warrant relief.  <u>Winter</u>, 555 U.S. at 22.  Thus, the Court will deny

Plaintiff's Petition for Temporary Restraining Order (Doc. No. 16) and Plaintiff's Motion Requesting Hearing on Petition (Doc. No. 33).[11]  A hearing is not warranted because the Petition for Temporary Restraining Order (Doc. No. 16) does not turn on a disputed factual issue.  See Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 719 n.16 (3d Cir. 2004).[12]

     An appropriate Order follows.

---

[11]  Plaintiff filed a Motion to Exclude as untimely Commonwealth Defendants' Memorandum of Law in Opposition to Plaintiff's Petition for a Temporary Restraining Order (Doc. No. 35).  This Motion also will be denied.

[12]  Although Plaintiff styles his Petition as one requesting a temporary restraining order, he refers to his Petition in other filings as one requesting a preliminary injunction.  (See Doc. No. 50 at 3; Doc. No. 54 at 1; Doc. No. 55 at 6.)  In any event, there are no factual disputes that would warrant an evidentiary hearing.