IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES D. ZEHRING, JR.,

                    Plaintiff,

        v.

JAMIE SORBER, et al.,

                    Defendants.

CIVIL ACTION
NO. 20-3195

## OPINION

**Slomsky, J.**                                    **January 22, 2024**

### Table of Contents

I.   **INTRODUCTION** .................................................................................................. 1

II.  **BACKGROUND** ................................................................................................... 2

    **A.  Factual Allegations** ........................................................................................ 3

      i.  Defendants and Their Positions at the State Correctional Institution
        at Phoenix, Pennsylvania ("SCI Phoenix") ........................................................ 3

      ii. Urology Claims ............................................................................................ 5

      iii. Ear-Related Claims ..................................................................................... 13

      iv. Summary of Claims .................................................................................... 17

III. **STANDARD OF REVIEW** .................................................................................. 18

IV.  **ANALYSIS** .......................................................................................................... 20

    **A.  Constitutional Violations under 42 U.S.C. § 1983 Against All Defendants**
    **(Count I)** .......................................................................................................... 21

i.  Claims Based on Grievances against Jamie Sorber, Tammy Ferguson and Joseph Terra, Officials at the State Correctional Institution at Phoenix, Pennsylvania (SCI Phoenix) ................................................................. 22

ii. Claims Based on Deliberate Indifference to Serious Medical Needs ............................... 24

    a.  Dr. Goldberg, SCI Phoenix's Medical Director .......................................... 27

    b.  Dr. Letizio, SCI Phoenix's Medical Director ............................................. 29

    c.  Dr. Lee Hanuschak, Assistant Medical Director for Correct Care Solutions, LLC ("CCS")/Wellpath ................................................................. 30

    d.  Nicola Wiener, as Executrix of the Estate of Dr. Stephen Wiener, who was SCI Phoenix's Medical Director ................................................................. 31

    e.  Superintendent Jamie Sorber, Deputy Secretary Tammy Ferguson and Joseph Silva, Medical Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections ("PA DOC") .................................. 33

    f.  Joseph Terra, Superintendent of SCI Phoenix .............................................. 35

    g.  Correct Care Solutions, LLC, ("CCS")/Wellpath, LLC ............................................... 36

    h.  Erica Benning, Department of Corrections Director of the Bureau of Healthcare Services ................................................................. 41

    i.  Dr. Jay Cowan, CCS/Wellpath State-Wide Medical Director ................................... 42

B.  **Civil Conspiracy (Count II)** .............................................................. 43

C.  **Medical Malpractice Claim against Defendants Nicola Wiener, Dr. Lee Hanuschak and Dr. Letizio (Count III)** .............................................. 44

D.  **Corporate Negligence of Defendant CCS/Wellpath (Count IV)** ................................. 46

V. **CONCLUSION** ................................................................. 48

I.      **INTRODUCTION**

On June 26, 2020, <u>pro se</u> Plaintiff Charles D. Zehring, Jr. ("Plaintiff"), an inmate at the State Correctional Institution at Phoenix ("SCI Phoenix"), initiated the present action by filing a Complaint. (<u>See</u> Doc. No. 2.) On September 14, 2022, the Court granted Plaintiff's Motion to file an Amended Complaint. (Doc. No. 108.) On March 3, 2023, Plaintiff filed the Amended Complaint, which is now the operative Complaint in this action. (Doc. No. 111.)

In his Amended Complaint, Plaintiff asserts that eleven (11) Defendants, including Superintendent Jamie Sorber, Superintendent Joseph Terra, Deputy Secretary Tammy Ferguson, Medical Director Joseph Silva, Nicola Wiener, as executrix of the estate of Dr. Stephen Wiener, Dr. Letizio,[1] Dr. Goldberg, Dr. Jay Cowan, Correct Care Solutions, LLC ("CCS")/Wellpath, LLC and Dr. Lee Hanuschak, committed various constitutional violations against him, triggering civil liability under 42 U.S.C. § 1983 and under Pennsylvania state law for corporate negligence, civil conspiracy and medical malpractice, all based on their involvement in his medical care.[2] Plaintiff seeks injunctive and monetary relief.

On May 1, 2023, Defendants CCS/Wellpath, Dr. Cowan, Dr. Hanuschak, Dr. Letizio and Nicola Wiener filed a Motion to Dismiss the Amended Complaint. (Doc. No. 123.) On the same day, Defendants Tammy Ferguson, Joseph Silva and Jamie Sorber also moved to dismiss the

---

[1] None of the filings in this case refer to Dr. Letizio or Dr. Goldberg by their first names. As such, the Court will only refer to Dr. Letizio and Dr. Goldberg by their surnames.

[2] As will be discussed <u>infra</u>, all Defendants except Nicola Wiener, were employees of SCI Phoenix, the Pennsylvania Department of Corrections ("PA DOC") or Correct Care Solutions, LLC, ("CCS")/Wellpath, LLC. CCS/Wellpath is a private corporation that contracted with the PA DOC to provide healthcare to inmates. Nicola Wiener is being sued in her capacity as executrix of the estate of Dr. Stephen Wiener, a doctor previously employed by SCI Phoenix who treated Plaintiff.

Amended Complaint.  (Doc. No. 126.)  On September 11, 2023, Defendant Dr. Goldberg filed a Motion to Dismiss.  (Doc. No. 157.)  On the same day, the remaining Defendants Erica Benning and Joseph Terra filed a Motion to Join Defendants Tammy Ferguson, Joseph Silva and Jamie Sorber's Motion to Dismiss for Failure to State a Claim.  (Doc. No. 158.)  Responses were filed to all three Motions to Dismiss which are now ripe for disposition.

## II.      BACKGROUND

Plaintiff is a 66-year-old veteran serving a life sentence at SCI Phoenix.  He alleges violations of his constitutional rights because of alleged delays in medical appointments and treatment at SCI Phoenix.  In his Amended Complaint, Plaintiff asserts four claims against Defendants.  In Count I, Plaintiff asserts a violation of his Eighth Amendment rights against all Defendants (Count I).  He also asserts in Count I due process claims under the Fifth and Fourteenth Amendments based on Defendants' responses to his numerous grievances.  In Count II, Plaintiff alleges a state law claim of civil conspiracy against Defendants Nicola Wiener, as the executrix of the estate of Dr. Stephen Wiener, Dr. Hanuschak, Dr. Goldberg, Dr. Letizio, Jamie Sorber, Tammy Ferguson, Joseph J. Silva and Erica Benning (Count II).  In Count III, he alleges a state law medical malpractice claim against Defendants Nicola Wiener, Dr. Hanuschak and Dr. Letizio (Count III).  Finally, he brings a state law corporate negligence claim against Defendant CCS/Wellpath (Count IV).

A.      **Factual Allegations**[3]

Plaintiff's allegations are lengthy.[4]   He contends that Defendants were deliberately indifferent to his urology and ear-related health issues and, as noted, brings claims under the Eighth, Fifth and Fourteenth Amendments, as well as claims under Pennsylvania state law for civil conspiracy, medical malpractice and corporate negligence.   Because Petitioner is proceeding pro se, at the Motion to Dismiss stage his factual allegations are being set forth at length in an attempt, however challenging, to describe the facts in the light most favorable to Plaintiff.   Though these allegations are long, the crux of his argument is that over a three-year period his serious medical needs were ignored for non-medical reasons of improper scheduling and insufficient transportation funding, thus violating his Eighth Amendment and other rights.   Because Plaintiff's factual allegations name numerous individuals, with some named as Defendants and some not so named, the Court will begin by outlining the names and position of Defendants, and then describing Plaintiff's lengthy factual allegations.

i.      Defendants and Their Positions at the State Correctional Institution at Phoenix, Pennsylvania ("SCI Phoenix")

Although Plaintiff's factual allegations are not specific as to when Defendants held their positions at SCI Phoenix, nonetheless, their positions during the time period pled in the Amended Complaint and in the Counts in which they are named as Defendants are shown in the chart below:

---

[3] For ease of reading, the Court will cite to both pages and specific paragraphs of Plaintiff's Amended Complaint.

[4] Plaintiff's Amended Complaint is 48 pages long and contains 349 numbered paragraphs.   (See Doc. No. 111.)

| Defendant | Position | Counts Alleged[5] |
|---|---|---|
| Nicola Wiener | Executrix of the estate of Dr. Stephen Wiener, who was SCI Phoenix's Medical Director | I, II, III |
| Dr. Lee Hanuschak | Assistant Medical Director for CCS/Wellpath | I, II, III |
| Dr. Goldberg | SCI Phoenix's Assistant or acting Medical Director | I, II |
| Dr. Letizio | SCI Phoenix's Medical Director | I, II, III |
| Jamie Sorber | Superintendent of SCI Phoenix | I, II |
| Tammy Ferguson | Deputy Secretary of SCI Phoenix[6] | I, II |
| Joseph Terra | Current Superintendent of SCI Phoenix, replaced Sorber | I |
| Joseph J. Silva | Director of the Bureau of Health Care Services of PA DOC | I, II |
| Erica Benning | Director of the Bureau of Health Care Services of PA DOC | I, II |
| Dr. Jay Cowan | CCS/Wellpath State-Wide Medical Director | I |
| Correct Care Solutions, LLC, ("CCS")/Wellpath, LLC | Private independent healthcare corporation that contracts with prisons to provide healthcare services to inmates | I, IV |

---

[5]  As noted earlier, Count I alleges Eighth, Fifth and Fourteenth Amendment claims brought under 42 U.S.C. § 1983; Count II alleges a Pennsylvania state law civil conspiracy claim; Count III alleges a state law medical malpractice, and Count IV alleges a corporate negligence claim.

[6]  Tammy Ferguson is identified in the Amended Complaint both as a "Superintendent" and "Deputy Secretary" of SCI Phoenix.  In her Motion to Dismiss (Doc. No. 126), Defendant Ferguson describes her title as "Deputy Secretary."  For the purposes of this Motion, the Court will refer to Defendant Ferguson's title as "Deputy Secretary of SCI Phoenix."

ii.   Urology Claims

On May 11, 2018, Plaintiff underwent a TURP[7] procedure performed by non-party Dr. Belkoff[8], a urological specialist contracted by the Pennsylvania Department of Corrections ("PA DOC").  During the procedure, a post-surgical catheter is inserted.  It is removed five days after surgery.  (Doc. No. 111 at 6, 8.)  The procedure was performed to treat Plaintiff's symptoms of hyper-urination, thickening of the bladder wall and to relieve bladder pain.  (Id. at 6.)  Following the surgery, Dr. Belkoff requested a thirty (30) day post-surgical follow up appointment.  (Id.)

On August 20, 2018, Plaintiff went to a sick call[9] and complained about the lack of a follow up appointment.  (Id. at 7.)  On September 24, 2018, Plaintiff wrote to non-party Welsh, who is identified as a Correctional Health Care Administrator, to complain that he had not received a follow up appointment with non-party Dr. Manfrey.[10]  On October 18, 2018, he wrote to non-party Deputy Warden Sipple, who Plaintiff states is in charge of the SCI Phoenix medical department,

---

[7]   A "TURP" procedure is a transurethral resection of the prostate ("TURP") done surgically to treat urinary problems caused by an enlarged prostate.

[8]   Throughout his factual allegations, Plaintiff refers to several Defendants by only their last names and position.

[9]   According to the Pennsylvania Department of Corrections Policy Statement, a sick call is defined as:

> the process used by inmates who experience non-emergent medical/dental problems to access medical services; an examination by a physician, physicians assistant, nurse practitioner, or nurse.

DC-ADM 820, Co-Payment for Medical Services Procedures Manual Glossary of Terms (effective date Nov. 8, 2021).

[10]   Dr. Manfrey is a urological specialist associated with Dr. Belkoff.  Neither Dr. Manfrey nor Dr. Belkoff are named as Defendants in this action.

to complain that non-party Welsh would not schedule his outside appointment with Dr. Manfrey, the urology specialist.  (Id.)

On November 16, 2018, Plaintiff received his post-surgical appointment with Dr. Manfrey but complains that the appointment took place at SCI Phoenix rather than at Dr. Manfrey's office. (Id. at 8.)  He asserts this delay was unreasonable because Dr. Manfrey visits the prison twice each month.[11]  (Id.)  He was not treated for seven months by any other prison medical personnel for the urological problem, apart from the personnel who removed the catheter after surgery.  (Id.)  At the November 16, 2018 appointment with Dr. Manfrey, the doctor told Plaintiff that he required an endoscopy because the surgical procedure did not relieve his symptoms and that the procedure would be done before Christmas 2018.  (Id.)  On December 22, 2018, Plaintiff wrote to Defendant Joseph Silva, who is identified as the Director of the Bureau of Health Care Services of the PA DOC, complaining that the endoscopy had not been scheduled.  (Id.)  On December 27, 2018, Defendant Silva replied that SCI Phoenix would provide medical services on par with community standards and SCI Phoenix staff would assess and appropriately treat his condition.  (Id.)  On January 2, 2019, Plaintiff wrote to Defendant Silva again, complaining that his medical care was being delayed for non-medical reasons because his endoscopy procedure had not been scheduled. (Id.)

On January 25, 2019, Plaintiff had an ultrasound at SCI Phoenix.  (Id.)  Plaintiff alleges that he was not told why he was given an ultrasound.  (Id.)  On February 5, 2019, Plaintiff filed another grievance about the delay in seeing Dr. Manfrey for the endoscopy.  (Id.)  Plaintiff's grievance was upheld in part, and Plaintiff saw Dr. Manfrey in his office on February 21, 2019.

---

[11]  While Dr. Belkoff requested a 30-day follow up on May 11, 2018, the follow up appointment did not take place until November 16, 2018, roughly 189 days later.

(Id.)  During this visit, Dr. Manfrey performed the endoscopy and wrote him a prescription for medication.  (Id.)

On April 5, 2019, Plaintiff had an appointment with Dr. Manfrey at SCI Phoenix.[12]  (Id. at 9.)  Dr. Manfrey told him he needed another procedure and needed to be seen at Dr. Manfrey's office for further testing.  (Id.)  Following this visit, Plaintiff attended sick calls on four dates to ask about scheduling the procedure.  (Id.)  The employees attending to his sick calls emailed Defendant Dr. Lee Hanuschak,[13] who Plaintiff alleges was in charge of scheduling outside medical appointments.  (Id.)  On May 10, 2019, Plaintiff spoke with Dr. Hanuschak while waiting in line at a sick call and asked why the April 5, 2019 appointment occurred at the prison rather than at Dr. Manfrey's office.  (Id.)  Dr. Hanuschak responded that Dr. Manfrey wanted all appointments at his office, but there were insufficient prison resources for all medically necessary trips outside the prison.  (Id.)  Plaintiff alleges that he did not receive outside doctor visits based on this non-medical reason and filed a grievance on May 12, 2019.  (Id.)  He asserts that Defendants Tammy Ferguson and Joseph Silva[14] failed to address the issue he raised in his grievance, made mistakes of fact, and denied his grievance on the ground that he received proper medical care.  (Id.)

In June 2019, Plaintiff was suffering from a distended bladder.  (Id.)  On June 14, 2019, he went to a sick call and was seen by Dr. Hanuschak.  (Id.)  He asked to see Dr. Manfrey but was told that before he could be scheduled to see Dr. Manfrey, he would need to receive an ultrasound at the prison.  (Id.)  Plaintiff wanted the ultrasound to be done at Manfrey's office, but Dr.

---

[12] Plaintiff complains that this visit was improperly scheduled at SCI Phoenix when it should have been at Dr. Manfrey's office.  (Id.)

[13] Defendant Dr. Hanuschak is identified as the Assistant Medical Director for CCS/Wellpath.

[14] Once again, Defendant Tammy Ferguson is a Superintendent of SCI Phoenix and Joseph Silva is the Director of the Bureau of Health Care Services of the PA DOC.

Hanuschak stated that it could be done at the prison.  (Id. at 8-9.)  On June 28, 2019, Plaintiff had a distended bladder ultrasound at SCI Phoenix.  (Id. at 9.)  On August 9, 2019, Plaintiff saw Dr. Manfrey at SCI Phoenix.  (Id.)  Dr. Manfrey told Plaintiff that he needed a special type of ultrasound that could not be performed at the prison and made a request to SCI Phoenix officials to have Plaintiff brought to his outside office.  (Id.)  On September 25, 2019, Dr. Manfrey performed an ultrasound at his office that showed Plaintiff's TURP procedure had worked, but he had an unstable bladder.  (Id. at 10.)  Dr. Manfrey prescribed a medication and asked to see Plaintiff again at SCI Phoenix in thirty (30) days.  (Id.)

On November 2, 2019, Plaintiff filed another grievance because the thirty-day (30) appointment had not been scheduled.  (Id.)  On November 3, 2019, he wrote to Defendant Silva about this delay.  (Id.)  On December 9, 2019, Defendant Silva responded stating that he should use the prison grievance process to raise his claim.  (Id.)  On December 18, 2019, Plaintiff saw Dr. Wiener[15] on the prison sidewalk and asked him why the ear and urology specialist appointments had not been scheduled.  (Id.)  Dr. Wiener agreed to investigate these scheduling issues.  (Id. at 11.)

On February 21, 2020, Plaintiff received another appointment with Dr. Manfrey at SCI Phoenix.  (Id.)  At this appointment, Dr. Manfrey told Plaintiff he would need peripheral nerve stimulation treatment ("PNS")[16] to ease his symptoms and that Dr. Manfrey would arrange with

---

[15] The Executrix of Dr. Stephen Wiener's estate, Nicola Wiener, is a Defendant in this case.

[16] Percutaneous Nerve Stimulation is referred to as both "PNS" and "PTNS" for Percutaneous Tibial Nerve Stimulation. The Mayo clinic states that:

> Percutaneous tibial nerve stimulation, or PTNS, is a newer treatment for those dealing with overactive bladder symptoms, and many patients are having great success with this procedure. . . PTNS is designed to stimulate the nerves responsible for bladder control using the tibial nerve in your lower leg. . . Each treatment lasts

the SCI Phoenix medical director, Dr. Wiener, for him to get treatment at the prison.  (Id.)  Dr. Manfrey also put him down for another appointment in thirty (30) days.  (Id.)  On February 28, 2020, Plaintiff filed another grievance to complain that he had not been told what the Medical Director determined would be his treatment plan.  (Id.)

On March 18, 2020, Plaintiff was seen by Dr. Wiener for his migraine headaches.  (Id.)  He raised with Dr. Wiener that he wanted a follow up appointment with Dr. Manfrey and expressed that his urological conditions were painful.  (Id.)  Dr. Wiener mentioned that lack of transportation resources was pushing back his appointments.  (Id.)

In March 2020, the COVID-19 pandemic began and all non-emergency outside medical trips were cancelled by SCI Phoenix.  (Id. at 12.)  On March 25, 2020, Plaintiff had a kidney and bladder ultrasound procedure at the prison but was not told the purpose of the ultrasound.  (Id.)  On September 2, 2020, Plaintiff wrote to non-party Kathy Levey, Clinical Coordinator for CCS/Wellpath at SCI Phoenix inquiring about seeing Dr. Manfrey.  (Id.)  On September 16, 2020, Levey responded that Dr. Manfrey was not yet seeing patients, but she would work to schedule Plaintiff as soon as she could.  (Id.)

On or about October 1, 2020, SCI Phoenix officials implemented new quarantine procedures forcing inmates to double up in medical quarantine.  Further, Plaintiff's potential exposure to COVID-19 would increase if he attended outside medical appointments.  (Id.)  On November 18, 2020, Plaintiff wrote to Defendant Silva complaining that these practices were

---

approximately 30 minutes, and you would typically receive 12 treatments one week apart. After the first 12 weeks, your provider will evaluate your response to treatment and determine if additional treatments are necessary.

See https://www.mayoclinichealthsystem.org/locations/bloomer/services-and-treatments/urology/percutaneous-tibial-nerve-stimulation.

unsafe.  (Id.)  Defendant Silva never responded to this letter.  (Id.)  Delays in treatment were then caused by the Covid-19 pandemic.  (Id.)

On August 20, 2021, when the Covid-19 pandemic had subsided, Plaintiff saw Dr. Manfrey at the prison.  (Id. at 13.)  Dr. Manfrey recommended that Plaintiff be brought to his office for a Percutaneous Nerve Stimulation ("PNS") treatment for his bladder and for an ultrasound.  (Id.)  Dr. Manfrey stated that he would call Defendant Dr. Goldberg[17] next week to schedule these treatments.  (Id.)  On September 7, 2021, Plaintiff went to a sick call to check on his appointment status and was told there was no urology appointment in the system.  (Id.)  Following this sick call, Plaintiff wrote to non-party Kathy Level, CCS/Wellpath Clinical Coordinator at SCI Phoenix, inquiring about his neurology, urology, audiology and ear appointments.[18]  (Id.)  On September 13, 2021, Levey responded that these appointments would be scheduled.  (Id.)

On September 21, 2021, Plaintiff attended a sick call to inquire about the status of his urology appointment.  (Id. at 14.)  He saw non-party nurse practitioner Kennedy who stated that all she could find on the computer was incomplete paperwork and there were no notes delineating a treatment plan.  (Id.)  At this time, Plaintiff alleges SCI Phoenix did not have an assistant medical director and Defendant Dr. Goldberg, the then acting Medical Director, did not review nor complete the paperwork Plaintiff needed for his urological treatment.  (Id.)   Plaintiff filed a grievance that this delay caused him substantial pain and suffering which included painful spasms, burning urges to urinate and approximately 14 trips to the bathroom per day, all related to his urological condition.  (Id.)

---

[17] Defendant Dr. Goldberg was the acting Medical Director of SCI Phoenix.

[18] The reference to neurology and audiology appointments is the only mention in the Amended Complaint of these medical appointments.

On October 8, 2021, Plaintiff went to a sick call for migraine headaches. (Id.) At this call, he met with Defendant Dr. Goldberg. In addition to his migraine concerns, he complained about the same urological issues he had complained about in his grievance.[19] (Id.) Dr. Goldberg stated that he would investigate Plaintiff's treatment plan. (Id. at 14-15.) On November 9, 2021, Plaintiff attended another sick call for the same urological complaints and wrote an email to Defendant Dr. Letizio, the new Medical Director, about this issue. (Id. at 15.)

On November 12, 2021, Plaintiff received a response to his September 21, 2021 grievance. (Id.) Plaintiff asserts that this response incorrectly stated that he saw Dr. Manfrey on October 18, 2021. (Id.) He appealed this response to Defendant Sorber, the Superintendent of SCI Phoenix, who agreed that Plaintiff was not seen by Dr. Manfrey on October 18, 2021, but that he would have an appointment on November 22, 2021. (Id.) This visit did not take place until December 3, 2021. (Id.)

During the December 3, 2021 appointment Plaintiff received an ultrasound at the prison. (Id.) On December 26, 2021, Plaintiff wrote to Defendant Erica Benning, Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections, complaining about the delays in his treatment allegedly caused by the lack of prison resources. (Id.) On December 28, 2021, Plaintiff had a sick call to inquire about the status of his ear, urology and migraine specialist appointments. (Id. at 16.)

On January 13, 2022, Plaintiff saw non-party urological specialist Dr. Walker[20] at his office. (Id.) Dr. Walker determined Plaintiff required surgery to repair a reoccurrence of a

---

[19] Plaintiff again complained of painful spasms, burning urges to urinate and approximately 14 trips to the bathroom per day, all caused by his ongoing urological issues. (Id.)

[20] Dr. Walker was the temporary replacement for Dr. Manfrey. (Id.)

previous varicocele[21] and confirmed the need for PNS treatment.  (Id.)  On January 14, 2022, Plaintiff wrote to non-party Corrections Health Care Administrator Huner concerning the delay in his treatments.  (Id.)  On January 19, 2022, Plaintiff attended a sick call to check on the status of his appointments.  (Id.)  On January 20, 2022, Huner wrote back, stating that Plaintiff's urology and ENT appointments were scheduled.  (Id.)

On February 18, 2022, Plaintiff attended a sick call to check on his appointments and found that none were scheduled.  (Id. at 17.)   At this call, the physicians-assistant on call emailed Defendant Dr. Letizio, SCI Phoenix's Medical director, about the scheduling.  (Id.)  On February 20, 2022, Plaintiff filed a grievance complaining of the delay and lack of an approved treatment plan.  (Id.)  On April 22, 2022, Plaintiff again went to a sick call and inquired about the status of his urology appointments.  (Id. at 18.)  Throughout May and June, Plaintiff filed several grievances and correspondence complaining about the delay in his care.  (See id. at 18-19.)

On July 21, 2022, Plaintiff saw Dr. Walker for a follow up appointment.  (Id.)  Non-party Dr. Walker told Plaintiff that his varicocele surgery was approved and waiting to be scheduled but his PNS treatment was not.  (Id.)  Dr. Walker allegedly stated that Defendant Dr. Letizio told him that the PNS treatment was not approved because it was a multi-trip treatment plan, and he was not permitted to prescribe such treatment plans.  (Id.)  Dr. Walker discussed alternate treatment plans and recommended Botox injections in the bladder.  (Id. at 19.)

---

[21] A varicocele is an enlargement of the veins within the loose bag of skin that holds the testicles. These veins transport oxygen-depleted blood from the testicles.  See https://www.mayoclinic.org/diseases-conditions/varicocele/symptoms-causes/syc-20378771#:~:text=A%20varicocele%20(VAR%2Dih%2D,efficiently%20out%20of%20the%20s crotum.

Plaintiff filed a grievance that his PNS treatment was not approved.  (See id.)  On July 27, 2022, Plaintiff received a response to his grievance stating that his PNS treatment was denied because it was an elective procedure that could be managed with medications.  (Id. at 19-20.)

On October 11, 2022, Plaintiff had varicocele surgery at Lankenau Hospital.  (Id. at 20.) During the pre-op discussion with Dr. Walker, Plaintiff informed Dr. Walker that the Botox treatment was not yet scheduled.  (Id.)  Dr. Walker then prescribed two medications to treat Plaintiff's bladder issues.  (Id.)  Plaintiff's problems with his bladder are ongoing.

### iii.   Ear-Related Claims

On August 16, 2018, Plaintiff underwent surgery performed by non-party Dr. Pollak[22] at Temple Hospital to remove a tumor in his right ear.  (Id. at 22.)  On August 27, 2018, Plaintiff had his first post-surgical follow up with Dr. Pollak who requested a second follow-up in four weeks. (Id.)  On September 24, 2018, Plaintiff wrote a request to non-party Correction Health Care Administrator ("CHCA") Welsh complaining that his second follow up had not been scheduled. (Id.)  Plaintiff lodged a similar complaint to Defendant Silva, Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections.  (Id.)

On October 17, 2018, Plaintiff had a second post-surgical follow up where Dr. Pollak applied medication to his ear and requested a two-week follow-up.  (Id.)  On November 26, 2018, Plaintiff saw Dr. Pollak in her office for a third follow-up.  (Id. at 24.)  Dr. Pollak stated that Plaintiff required a second "look-back" surgery and requested a January 2019 follow-up.  (Id.)  On December 22, 2018, Plaintiff wrote to Defendant Silva complaining that his outside medical care

---

[22] Dr. Pollak is an Ear, Nose and Throat specialist ("ENT") who works for Temple Hospital.  Temple Hospital contracts with CCS/Wellpath to provide specialist medical care to inmates.  Dr. Pollak is not named as a Defendant in this case.

was not being scheduled in a timely manner.  (Id.)  Plaintiff made the same complaint to Defendant Silva on January 2, 2019.  (Id.)

On January 23, 2019, Plaintiff again saw Dr. Pollak who requested a second surgery and recommended lifetime monitoring of the ear.  (Id.)  Plaintiff had pre-op evaluations on February 9 and March 15, 2019.  (Id. at 25.)  On April 4, 2019, Plaintiff underwent ear surgery to implant a device to replace the bones removed from the ear during the tumor surgery.  (Id.)  Plaintiff was taken to a post-surgical appointment on April 10, 2019, but no further appointments were made. (Id.)

On May 10, 2019, Plaintiff asked Defendant Dr. Hanuschak if another appointment had been made with Dr. Pollak, but according to Plaintiff, Dr. Hanuschak did not want to discuss this matter.  (Id.)  On June 2, 2019, Plaintiff filed a grievance about the failure to provide another outside visit.  Defendants Tammy Ferguson and Silva denied it because this was a clinical decision by prison medical staff and found no evidence of wrongdoing.  (Id.)  On June 14, 2019, Plaintiff attended a sick call with Dr. Hanuschak and asked if his post-surgical appointment had been scheduled.  (Id. at 26.)  On September 4, 2019, Plaintiff saw non-party ear nose and throat specialist ("ENT") Dr. Whitely for a post-surgical follow up.  (Id.)  Dr. Whitely determined that Plaintiff's ear was infected, prescribed a medication, and recommended that he come back in two to three months for another follow up.  (Id.)  On October 23, 2019, Plaintiff filed a grievance because he had not been brought back for the follow up and because his ear had been continually bleeding since the April 4, 2019 surgery.  (Id.)  Defendants Ferguson and Silva responded to the grievance, noting that Plaintiff had several upcoming appointments.  (Id.)

On November 4, 2019, roughly two months later, Plaintiff saw Dr. Pollak who diagnosed Plaintiff with a large polyp[23] on his right eardrum, applied medication and warned Plaintiff that it might require surgery.  (Id.)  Plaintiff alleges that the delay in medical treatment caused this alleged "residual injury."  (See Doc. No. 134 at 20.)  In the months following this appointment, Plaintiff lodged several more complaints about delays in his appointments and spoke with Dr. Wiener who told him that the prison did not have enough medical transport vans, and that several were worn out.  (Doc. No. 111 at 27.)

On February 28, 2020, Plaintiff filed a grievance complaining about his delay in treatment and his ear still bleeding.[24]  (Id.)  On May 18, 2020, non-party Dr. Bazel examined Plaintiff's ear and told plaintiff it looked "red."  (Id. at 28.)

On July 29, 2020, about nine months later, Plaintiff saw non-party Dr. Pollak at Temple Hospital to treat this condition.  (Id.)  Plaintiff told Dr. Pollak that his ear was painful and either bleeds or emits fluid every day.  (Id.)  Dr. Pollak saw multiple polyps on his eardrum that almost covered the myringotomy tube located there.[25]  (Id.)  Dr. Pollak recommended surgery because "she wasn't sure the prison would bring Plaintiff back in the requested time frame or at all."  (Id.)  Plaintiff had a pre-surgery workup on August 11, 2020.  (Id.)

On August 13, 2020, Plaintiff had surgery that involved the removal of all polyps and a small tumor in his ear.  (Id.)  After the surgery, Plaintiff suffered from nausea and jaw pain and

---

[23] An ear polyp is "a growth in the outside (external) ear canal or middle ear. It may be attached to the eardrum (tympanic membrane), or it may grow from the middle ear space. . . Bloody drainage from the ear is the most common symptom. Hearing loss can also occur." https://medlineplus.gov/ency/article/001638.htm.

[24] In March 2020 the Covid-19 pandemic began.  (Id.)

[25] Plaintiff also alleged that this polyp was a "residual injury" caused by the delay in care.  (See Doc. No. 134 at 20.)

was given medication at Temple Hospital for these conditions.  (<u>Id.</u> at 29.)  When he returned to the prison, he was not given any more pain medication.  (<u>Id.</u>)  Plaintiff states that he was in pain for two weeks before he was able to see a prison nurse and receive pain medication.  (<u>Id.</u>)  On August 21, 2020, Plaintiff attended a sick call because he had trouble breathing since the surgery.  (<u>Id.</u>)  On August 28, 2020, and September 10, 2020, Plaintiff saw non-party Dr. Pollak for post-surgical follow ups.  (<u>Id.</u>)  At the September visit, Dr. Pollak removed a small polyp from Plaintiff's ear.  (<u>Id.</u>)

On July 13, 2021, Plaintiff saw Dr. Pollak who told him that his ear looked good but that he had a low-grade infection.  (<u>Id.</u> at 30.)  The doctor recommended a two to three month follow up to replace the tubes in both of his ears, a right ear tinnitus masking hearing aid, Pepcid for acid reflux and antibiotics.  (<u>Id.</u>)  In the following months, Plaintiff attended several sick calls complaining that the follow up was not scheduled.  (<u>Id.</u> at 31.)

On January 11, 2022, Plaintiff saw Dr. Pollak who diagnosed and treated both ears for an infection.  (<u>Id.</u>)  On April 5, 2022, Plaintiff again saw Dr. Pollak who stated that both ears were still infected and leaking fluid and prescribed the medication Azelastine.  (<u>Id.</u>)  On April 22, 2022, Plaintiff attended a sick call to renew the medication.  (<u>Id.</u>)  At the sick call he complained about the delay in his follow up appointments.  (<u>Id.</u>)

On May 23, 2022, Plaintiff wrote to non-party Correction Health Care Administrator Huner complaining about the delay in seeing ENT Dr. Pollak.  (<u>Id.</u> at 34.)  On June 2, 2022, Plaintiff filed a grievance with the same complaint.  (<u>Id.</u>)  On June 28, 2022, non-party Deputy Warden Sipple responded to an earlier grievance and told Defendant that he "has a pending appointment with Dr. Pollak's office that has been approved in April 2022 as a follow up and procedure."  (<u>Id.</u>)  Sipple further stated that "[t]here are a limited number of outside trip slots available daily.  These trips

are prioritized by acuity and urgency. Your appointments are being scheduled according to the severity of you[r] condition and the availability of the doctor offices and the prison vehicles." (Id.)

On September 29, 2022, Plaintiff was taken to see Dr. Pollak, but upon arrival at Temple Hospital, Dr. Pollak was not there. (Id.) Instead, Plaintiff saw non-party Dr. Oneida Arosarena who examined his ears and found that Plaintiff's right ear was infected. (Id.) Dr. Arosarena prescribed medication and recommended a two to three week follow up. (Id.) On October 16, 2022, Defendant Terra replaced Defendant Jamie Sorber as the Superintendent of SCI Phoenix. (Id.)

Plaintiff alleges that the delay in treating his ear deprived him of his constitutional rights and violated state law. The delay caused him pain and suffering in the form of an infection, bleeding, loss of hearing and lifetime monitoring of the ear. (Id.)

    iv. <u>Summary of Claims</u>

Plaintiff concludes his lengthy factual recitation with several assertions against each Defendant. (<u>See id.</u> at 36-43.) He asserts that the four doctors sued, Dr. Lee Hanuschak, Dr. Goldberg, Dr. Letizio, and Nicola Wiener, executrix of the estate of Dr. Wiener, were deliberately indifferent to his serious medical needs when they delayed his medical treatment for the non-medical reasons of scheduling and insufficient transportation resources. (<u>Id.</u> at 36-37.) He asserts that Defendants Jamie Sorber, Tammy Ferguson and Joseph Terra, and all officials of SCI Phoenix, were deliberately indifferent to his serious medical needs because they controlled the budget that did not fund a sufficient number of buses to take him to his medical appointments. (<u>Id.</u> at 37-38.) He makes similar claims against Defendants Joseph J. Silva in his role as Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections, and Erica Benning, when she was in the same role. (<u>Id.</u> at 39-40.) He also makes similar claims against CCS/Wellpath

State-wide Medical Director Dr. Cowen.  (Id. at 41-42.)  Finally, he states that the corporate entity, CCS/Wellpath, failed to properly monitor its employees and created a "custom or policy" that resulted in the violation of this constitutional rights.  (Id. at 42-43.)

In sum, Plaintiff complains that Defendants committed state and federal violations described earlier. He requests injunctive relief in the form of ordering Defendants to provide sufficient treatment and ordering Defendants to follow all medical specialist recommendations. (Id. at 48.)  He also seeks monetary relief.  (Id.)  Defendants, on the other hand, seek to have the Amended Complaint dismissed.  For the reasons that follow, Defendant's Motions will be granted in part and denied in part.

### III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

When determining whether a claim is plausible, a district court may also consider any affirmative defenses raised by the moving party.  "Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer."  Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (citing Fed. R. Civ. P. 12(b)).  However, the so-called "Third Circuit Rule" allows affirmative defenses to be raised in a 12(b)(6) motion.  Id.; see also Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013) cert. denied, 134 S. Ct. 1547 (U.S. 2014) ("[A] number of affirmative defenses that are not listed in Rule 12(b) [can] still be made by motion, provided that the basis of the defense [is] apparent on the face of the complaint."); Bethel v. Jendoco Const.

Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) ("[A]n affirmative defense may be raised on a 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint."). For instance, a qualified immunity defense may be raised in a motion to dismiss. Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 n.3 (3d Cir. 2001) ("qualified immunity may be raised in a motion to dismiss at the pleading stage . . . .").

### IV.    ANALYSIS

In his Amended Complaint, Plaintiff brings multiple claims.  Based upon the analysis infra, his claims will move forward in this case in part:  his Eighth Amendment claim under 42 U.S.C. § 1983 as alleged in Count I will be dismissed against Defendants Joseph Terra, Erica Benning and Dr. Cowan, but will not be dismissed against all other Defendants.  Further, the due process grievance-based claims in Count I will be dismissed against Defendants Sorber, Ferguson and Terra, the only Defendants named in this claim.  Plaintiff's Count II state law civil conspiracy claim brought against Defendants Nicola Wiener, Dr. Hanuschak, Dr. Goldberg, Dr. Letizio, Jamie Sorber, Tammy Ferguson, Joseph J. Silva and Erica Benning will be dismissed in its entirety. Plaintiff's Count III state law medical malpractice claim against Defendants Nicola Wiener, Dr. Hanuschak and Dr. Letizio will be dismissed in its entirety.  Finally, Plaintiff's Count IV state law corporate negligence claim against Defendant CCS/Wellpath will not be dismissed.  In sum, Counts II and III will be dismissed in their entirety, but Plaintiff has alleged sufficient facts to plausibly support the Eighth Amendment claim in Count I against Defendants Wiener, Dr. Hanuschak, Dr. Goldberg, Dr. Letizio, Sorber, Ferguson, Silva, and CCS/Wellpath.  In addition, Count IV alleging corporate negligence will not be dismissed against CCS/Wellpath.

### A. Constitutional Violations under 42 U.S.C. § 1983 Against All Defendants (Count I)

Plaintiff's Amended Complaint relies on 42 U.S.C. § 1983 for asserting his constitutional claims. This Section provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

As noted previously, in his Amended Complaint, Plaintiff asserts two constitutional claims under 42 U.S.C. § 1983. First, he asserts that three Defendants, Jamie Sorber, Tammy Ferguson and Joseph Terra, officials at SCI Phoenix, violated his due process rights under the Fifth and Fourteenth Amendments by improperly addressing his grievances. (Doc. No. 111 at 37-38.) Second, he asserts a violation of his Eighth Amendment right not to be subject to cruel and unusual punishment as a result of deliberate indifference to his serious medical needs against all Defendants. (Id. at 36.) Defendants moved to dismiss these claims for failure to state a claim upon which relief can be granted. (See Doc. Nos. 123, 126, 157.) Some Defendants also argue they were not personally involved in the alleged violations. For reasons discussed below, the Court will grant Defendants Motions to dismiss in part and deny them in part. The Court will begin by addressing the grievance-based claims, which will be dismissed in full.

        i.       <u>Claims Based on Grievances against Jamie Sorber, Tammy Ferguson and Joseph Terra, Officials at the State Correctional Institution at Phoenix, Pennsylvania (SCI Phoenix)</u>

Plaintiff first asserts due process claims under § 1983 based on the handling of his prison grievances against Defendants Jamie Sorber, Tammy Ferguson and Joseph Terra, officials of SCI Phoenix.  (Doc. No. 111 at 38.)  Plaintiff alleges that in their respective roles, they oversaw SCI Phoenix's grievance process and failed to address ongoing constitutional violations asserted in his grievances.  (<u>Id.</u> at 37-38.)  Defendants counter that their review of, or decision on, an inmate's grievance is not sufficient to establish a constitutional violation.  (Doc. No. 126 at 17.)  The Court agrees.

Plaintiff's claim based on the handling of his prison grievances fails because "[p]rison inmates do not have a constitutionally protected right to a grievance process."  <u>Jackson v. Gordon</u>, 145 F. App'x 774, 777 (3d Cir. 2005) (per curiam); <u>see</u> <u>also</u> <u>Caldwell v. Beard</u>, 324 F. App'x 186, 189 (3d Cir. 2009) (per curiam).  Further, review or decision on an inmate's grievance is not sufficient to establish a constitutional violation or to even mean that defendant was sufficiently involved in the alleged violation.  <u>Simonton v. Tennis</u>, 437 Fed. Appx. 60, 63 (3d Cir. 2011) (dismissing plaintiff's claim against supervisors that allegedly failed to investigate plaintiff's grievances and holding that "[a] bare allegation of 'rubber stamping' does not suffice to establish a cognizable constitutional violation.").

Here, in his Amended Complaint, Plaintiff alleges that he complained of constitutional violations in his grievances but that Defendants both ignored and denied his claims.  For example:

    45. On February 5, 2019, Plaintiff filed grievance #785449 about yet another ongoing delay in seeing Dr. Manfrey. , ,

46. Defendants Ferguson and Silva/his agents,[26] upheld the grievance in part because the post-November 2018 visit follow-up was not scheduled in the 30 days policy required, yet still told Plaintiff that this was a clinic decision made by the attending practitioner.

. . .

57. On May 12, 2019, Plaintiff filed grievance #802173, complaining about this substandard medical care and continuing delay of medical care for non-medical reasons and was fully examined on the merits at the highest level.

58. Defendants Ferguson and Silva/his agents failed to address the issues grieved, made mistakes about the subject matter they were addressing, and denied the grievance telling Plaintiff that Plaintiff was receiving proper medical care.

. . .

110. Plaintiff appealed this defaulted grievance to Defendant Sorber, who on 12/1/21, upheld Plaintiff's claims that Plaintiff. . .

(See Doc. No. 111 at ¶¶ 45-46, 57-58.)   Further, there are several allegations in the Amended Complaint about grievances that he does not attribute to a specific Defendant, but generally makes the claim that Defendants Sorber, Ferguson and Terra were responsible for the grievance process. (See Doc. No. 111 at 37-38.)   Regardless of who Plaintiff points to as being involved in the grievance process, his grievance-based claim fails as a matter of law.   Similar to the plaintiff in Simonton, Plaintiff is alleging a constitution violation based on the handling and outcome of his grievances.   But inmates do not have a constitutionally protected right to a grievance process.   For this reason, his allegations are insufficient to state a constitutional violation and his Fifth and Fourteenth Amendment due process claims under 42 U.S.C. § 1983 will be dismissed.

---

[26] While Plaintiff mentions Joseph Silva in his factual allegations regarding grievances, he does not appear to assert a due process-based grievance claim against him.  Regardless, as will be discussed infra, all grievance claims brought by Plaintiff fail as a matter of law.

     ii.    <u>Claims Based on Deliberate Indifference to Serious Medical Needs</u>

Second, Plaintiff alleges that all Defendants violated his Eighth Amendment rights because they were deliberately indifferent to his serious medical needs by delaying medical treatment and relying on non-medical reasons for doing so.  Regarding this claim, the Court will first review the applicable law, and then discuss the facts relating to each Defendant.

The United States Supreme Court established in <u>Estelle v. Gamble</u> that "deliberate indifference to serious medical needs of prisoners constitutes [] 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."  429 U.S. 97, 105 (1976) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169-73 (1976)) (internal citation omitted).  In applying <u>Estelle</u>, the Third Circuit held that <u>Estelle</u> created a two-prong test that plaintiffs must satisfy to show an Eighth Amendment violation: (1) deliberate indifference by the prison officials and (2) that the prisoner's medical needs are serious.  <u>See</u> <u>West v. Keve</u>, 571 F.2d 158, 161 (3d Cir. 1978).

Turning to the first prong of deliberate indifference, the Third Circuit held that deliberate indifference is properly alleged when:

> . . . the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.

<u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).  Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  <u>See</u> <u>Spruill v. Gillis</u>, 372 F.3d 218, 235 (3d Cir. 2004).

Here, Plaintiff recognizes that he has received significant medical treatment, but alleges that they were delayed for budgetary and scheduling purposes.[27]  Thus, his claims are being brought under the second prong mentioned in Rouse: that the prison officials "delay[ed] necessary medical treatment based on a non-medical reason."

To sufficiently allege this claim, the Third Circuit has held that:

> [u]nlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim. Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim.  All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors.

Pearson v. Prison Health Services, 850 F.3d 526, 537 (3d Cir. 2017).  Accordingly, with a delay of medical treatment claim, "the deliberate indifference prong involves only the requisite state of mind" which "can be shown through "surrounding circumstances . . . sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." Dorsainvil v. Gallagher, 2022 WL 17887224, at *5 (D. N. J. Dec. 23, 2022).[28]

Turning now to the second prong of Estelle, "[a] medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cty. Corr.

---

[27]  While Plaintiff may disagree with the characterization of "significant", his factual allegations are in 278 numbered paragraphs and cover numerous in-prison and outside medical appointments and visits.  (See Doc. No. 111 at ¶¶ 17-293.)

[28]  In Dorsainvil, the court contrasted the pleading requirements of a delay claim with the additional elements that must be pled in an inadequate medical care claim.  Id.  Specifically that "a plaintiff may proceed to trial on an inadequate medical treatment claim only "when there is a genuine issue of fact regarding both the adequacy of care and the defendant's intent." Id.

Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Further, a serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991). Courts have also found a medical need to be considered serious when a "delay causes an inmate to suffer a life-long handicap or permanent loss." Monmouth, 834 F.2d at 347; see also Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir. 1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth.")

Finally, in addition to satisfying both prongs of Estelle, to properly state a claim a plaintiff must show that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Dooley v. Wetzel, No. 19-1684, slip op. at 13 (3d Cir. Apr. 27, 2020) (holding that attaching documents to grievance form is insufficient under Rode to show personal direction or actual knowledge by recipient of underlying facts)). Specifically, each named defendant must be shown to have been personally involved in the events or occurrences which underlie a claim. Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005); Rode, 845 F.2d at 1208. "Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence." Evancho, 423 F.3d at 353 (quoting Rode, 845 F.2d at 1207). Additionally, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." See Spruill, 372 F.3d at 236; see also Carter v. Smith, 483 F. App'x 705, 708 (3d Cir. 2012) (per curiam) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff.").

Here, accepting the facts alleged in the Amended Complaint as true, Plaintiff's ear and urological concerns are serious medical needs requiring numerous doctors' visits and surgery. He alleges that his urological condition caused him significant pain, suffering and is ongoing. With his ear problems, he alleges that the delay caused his ear painful infections and residual injury. In construing his allegations liberally, these allegations satisfy the second prong of the Estelle test.[29]

Moving to the first prong of the Estelle test, the pertinent analysis here is whether Plaintiff alleged sufficient facts to satisfy the deliberate indifference standard. As discussed above, to satisfy the Third Circuit's standard under Rouse, Plaintiff must allege that Defendants "delay[ed] necessary medical treatment based on a non-medical reason" and that each Defendant had "personal involvement in the alleged wrongs." See Rouse, 182 F.3d at 197, 201; Evancho, 423 F.3d at 353 (quoting Rode, 845 F.2d at 1207). The Court will discuss the allegations against each Defendant in turn.

### a.   Dr. Goldberg, SCI Phoenix's Medical Director

Plaintiff alleges that Defendant Dr. Goldberg was deliberately indifferent to his serious medical needs based on the delay in providing him with medical treatment for a non-medical reason. Dr. Goldberg counters that Plaintiff's claims fail to state a cognizable claim against him. (Doc. No. 157). The Court disagrees with Defendant. Plaintiff's factual allegations allege a sufficient § 1983 claim against Defendant Dr. Goldberg.

---

[29] At this stage, Defendants do not contend that Plaintiff's conditions are not serious. In their Motion to Dismiss, Defendants Tammy Ferguson, Joseph Silva and Superintendent Jamie Sorber state that "[f]or purposes of this Motion only, Plaintiff's urological and otorhinolaryngology ailments may be considered serious." (Doc. No. 126 at 20.) The other Defendants do not discuss whether Plaintiff's medical condition is serious or not.

As discussed above, deliberate indifference is properly alleged when a plaintiff shows that a defendant: ". . . (2) delay[ed] necessary medical treatment based on a non-medical reason" and the personal involvement of the defendant.  Rouse 182 F.3d at 197.  In Washington v. Gilmore, the Third Circuit applied this standard and found that a doctor who allegedly delayed treatment of a plaintiff's hemorrhoids "for no good medical reason" and subsequently caused plaintiff severe bleeding, satisfied the pleading standard to state a viable deliberate indifference claim.  See Washington v. Gilmore, 841 Fed. Appx. 466, 469 (3d Cir. 2021).

Plaintiff mentions Defendant Dr. Goldberg throughout his Amended Complaint.  (See Doc. No. 111).  He alleges that Dr. Goldberg oversaw scheduling Plaintiff's appointments, and failed to do so, causing him pain and suffering.  Specifically, he alleges that Dr. Goldberg, as acting Medical Director, "deliberately did not review and complete the consult paperwork nor enter a treatment plan going forward, the effect of which was to suspend all urological treatment."  (Id. at ¶ 100.)  For example, Plaintiff alleges that Defendant Dr. Goldberg was supposed to schedule his Percutaneous Nerve Stimulation ("PNS")[30] treatment for his urological problems but failed to do so, causing him "painful spasms, burning urges to urinate and approximately 14 trips to the bathroom per day" and a delay in his ear follow ups that caused a painful infection in his ear.  (Id. at ¶¶ 99-101, 105-07, 249.)[31]  Plaintiff also alleges personal involvement of Dr. Goldberg on

---

[30] See footnote 16, supra, for a complete discussion on PNS treatment.

[31] The chronology of facts regarding Dr. Goldberg and Plaintiff's PNS treatment are as follows:

> On August 20, 2021, Plaintiff saw Dr. Manfrey at the prison.  (Id. at 13.)  Dr. Manfrey recommended that Plaintiff be brought to his office for a Percutaneous Nerve Stimulation (PNS) treatment for his bladder and for an ultrasound.  (Id.)  Dr. Manfrey stated that he would call Defendant Dr. Goldberg next week to schedule these treatments.  (Id.)  On September 7, 2021, Plaintiff went to a sick call to check on his appointment status and was told there was no urology appointment in the system.  (Id.)

October 8, 2021, when he allegedly he spoke with Dr. Goldberg about the delays in care and the urological symptoms he was suffering from.  (Id. at 14.)

Viewing Plaintiff's factual allegations as true, they satisfy the elements of an Eighth Amendment violation.  Plaintiff alleges that Dr. Goldberg knew about Plaintiff's serious medical needs and that he delayed medical treatment for non-medical reasons.  Accordingly, Plaintiff's Eighth Amendment claim set forth in Count I of the Amended Complaint against Dr. Goldberg will not be dismissed.

b.  <u>Dr. Letizio, SCI Phoenix's Medical Director</u>

Plaintiff's allegations against Defendant Dr. Letizio are very similar to his allegations against Dr. Goldberg.  Plaintiff alleges that Dr. Letizio, in his role as SCI Phoenix's Medical Director,[32] delayed scheduling appointments which caused him pain and suffering.  (<u>See</u> Doc. No. 111.)  Defendant Dr. Letizio argues that he did not have sufficient personal involvement to sustain a claim against him.  (Doc. No. 125 at 14.)  However, viewing all factual allegations in the

---

. . .

On September 21, 2021, Plaintiff attended a sick call to inquire about the status of his urology appointment.  (<u>Id.</u> at 14.)  He saw non-party nurse practitioner Kennedy who stated that all she could find on the computer was incomplete paperwork and there were no notes delineating a treatment plan.  (<u>Id.</u>)  At this time, Plaintiff alleges SCI Phoenix did not have an assistant medical director and Defendant Dr. Goldberg, the then acting Medical Director did not review nor complete the paperwork he needed for his urological treatment.  (<u>Id.</u>) . . . This visit did not take place until December 3, 2021.  (<u>Id.</u>)

<u>See</u> Section II(A)(ii), <u>supra</u>.

[32]  Plaintiff alleges that both Dr. Letizio and Dr. Goldberg served as SCI Phoenix's Medical Directors. It is unclear from the pleadings whether they held this title at the same time or at different times. Regardless, Plaintiff has alleged sufficient facts to show that both Dr. Letizio and Dr. Goldberg were involved in the delay of medical care.

29

Amended Complaint as true, Plaintiff has alleged sufficient facts to show Dr. Letizio was aware of Plaintiff's medical needs and had personal involvement in the delay of his treatment.

Plaintiff alleges that Dr. Letizio, in his role as SCI Phoenix's Medical Director, oversaw scheduling his appointments and failed to do so.  (See Doc. No. 111 at ¶¶ 131-32.)  He alleges that there were non-medical reasons for delaying his treatment.  (See id.)  For example, Plaintiff alleges that urological specialist Dr. Walker examined Plaintiff on January 13, 2022 and "determined Plaintiff required surgery to repair a painful reoccurrence of a previous varicocele."[33]  (Id. at 16.)  Notably, Plaintiff's varicocele surgery did not occur until roughly nine months later, on October 11, 2022.  (Id. at 20.)  In the interim, Plaintiff filed grievances for the delay, contributing the scheduling failures to Dr. Letizio in his role as Medical Director.  (Id. at 17.)  Further, Plaintiff alleges that Dr. Letizio's delays contributed to a failure to get Plaintiff proper medication for his ear, a delay which caused an ongoing painful ear infection.[34]  (Id. at 32-33.)  In accepting these factual allegations as true, Plaintiff has alleged sufficient facts for a plausible § 1983 claim against Dr. Letizio.

    c.   Dr. Lee Hanuschak, Assistant Medical Director for Correct Care Solutions, LLC (CCS)/Wellpath

In his Amended Complaint, Plaintiff alleges that Defendant Dr. Lee Hanuschak was his doctor on several occasions.  Based on these interactions, Dr. Hanuschak was aware of his need

---

[33]  See footnote 21, supra, for a discussion on varicoceles and their symptoms.

[34]  Plaintiff states that on January 11, 2022, Plaintiff's ear specialist Dr. Pollak, diagnosed that both of Plaintiff's ears had an infection and recommended a 6-month treatment plan using medication. (Id. at 31-32.)  On February 18, 2022, Plaintiff went to a sick call to renew the medication.  (Id. at 32.)  Plaintiff stated that it was Dr. Letizio's role to renew this medication and that the renewal ultimately did not go through until April 22, 2022.  (Id. at 33.)  This delay caused Plaintiff to be without the medication Azelastine from March 3, 2022, until April 22, 2022.  (Id.)  He further alleged that he continued to have infections in his ears during this time.  (See id.)

for medical treatment and was personally involved in the delay in treatment.  Plaintiff submits that the delay was for non-medical reasons.  Dr. Hanuschak argues that the Amended Complaint does not allege sufficient facts against him.  (Doc. No. 125 at 14.)  The Court disagrees.

Plaintiff alleges that Dr. Lee Hanuschak, Assistant Medical Director for CCS/Wellpath, treated and spoke with him regarding his medical conditions on several occasions.  Plaintiff submits that while being seen by Dr. Lee Hanuschak, the doctor informed him that his outside appointments were being delayed because "the Commonwealth Defendants didn't provide enough resources for the medically necessary number of trips."  (Doc. No. 111 at ¶54-56.)  During the same visit, when Plaintiff asked Dr. Hanuschak why he was seeing the urologist at the prison rather than in his office, Dr. Hanuschak stated that the Department of Corrections refused to provide the resources to transport inmates offsite for their medical treatment.  Further, when Plaintiff was seen by Dr. Hanuschak on June 14, 2019 for an unrelated medical issue, he inquired about the status of his follow-up with Dr. Pollak, Plaintiff's ear specialist, and Dr. Hanuschak again stated that Plaintiff's treatment would be delayed.  (Id. at ¶ 203.)

Thus, in accepting all factual allegations as true, Plaintiff properly alleged that Dr. Hanuschak was aware of his serious medical needs, had personal involvement with getting him treatment, and delayed the treatment due to the lack of transportation or other resources, rather than for a medically based reason.  Thus, Plaintiff has alleged sufficient factual allegations to sustain an Eighth Amendment claim under § 1983 against Dr. Hanuschak.

> d.  <u>Nicola Wiener, as Executrix of the Estate of Dr. Stephen Wiener, who was SCI Phoenix's Medical Director</u>

Plaintiff also brings a § 1983 deliberate indifference claim against Defendant Nicola Wiener, as Executrix of the estate of Dr. Stephen Wiener, because Plaintiff claims that the now

deceased Dr. Wiener[35] delayed his medical treatment for non-medical reasons when Dr. Wiener treated him as a patient.  Nicola Wiener argues that the claim should be dismissed for failure to state a claim.  The Court disagrees because Plaintiff has pled sufficient facts to sustain his claim against Dr. Wiener.

As a threshold issue, Nicola Wiener, as executrix of the estate of Dr. Stephen Wiener, is a proper party in this case.[36]  Additionally, Plaintiff has pled sufficient facts against Dr. Wiener because Dr. Wiener both treated Plaintiff and discussed Department of Corrections ("DOC") scheduling problems with him.  For example, on March 18, 2020, Plaintiff was seen by Dr. Wiener for an unrelated medical issue.  (Doc. No. 111 at 11.)  When Plaintiff asked why he had not been seen by non-party Dr. Manfrey for his painful urological concerns, Dr. Wiener looked up the consultation and stated that Dr. Manfrey had not called him to discuss the treatment plan.  (Id.)

---

[35] Dr. Wiener passed away on January 28, 2022.  (Doc. No. 125 at 4.)

[36] Defendant Nicola Wiener does not object to being named as a Defendant in her Motion to Dismiss. Further, an analysis of this case's procedural history shows that Nicole Wiener, as executrix of the estate of Dr. Stephen Wiener, is a proper party in this case.

Rule 25(a)(1) of the Federal Rules of Civil Procedure states that "if a party dies and the claim is not extinguished, the court may order substitution of the proper party."  Fed. R. Civ. P. 25(a)(1). Under Rule 25(a)(1), a proper party can include a "legal representative or the trustee, administrator, or executor of the decedent's estate[] or an entity (such as an estate or a trust) that can be substituted for the decedent."  Aldossari on Behalf of Aldossari v. Ripp, 49 F.4th 236, 261 (3d Cir. 2022) (emphasis added).

Here, on June 26, 2020, Plaintiff commenced this instant action by filing a Complaint against Defendant Dr. Stephen Wiener, and other Defendants.  (Doc. No 2.)  During the discovery phase of this case, Dr. Wiener passed away.  (See Doc. No. 125 at 4.)  On August 29th, 2022, the Court granted substitution of Nicola Wiener, Executrix of the Estate of Stephen Wiener, for the deceased Defendant pursuant to Federal Rule of Civil Procedure 25(a)(1).  (Doc. No. 95.)  Then, on September 14, 2022, Plaintiff filed a Motion to File an Amended Complaint.  (Doc. Nos. 100, 101).  The Court granted the Motion (Doc. No. 108), and on March 1, 2023, Plaintiff filed an Amended Complaint naming Nicola Wiener, Executrix of the Estate of Stephen Wiener, as a Defendant.  (Doc. Nos. 109, 111.)

Also during this visit, Dr. Wiener purportedly told Plaintiff that the lack of DOC resources available for transporting inmates was pushing appointments further out in time. (Id.)

These factual allegations, taken as true, demonstrate that Dr. Wiener was aware of Plaintiff's serious medical needs and that his treatment was being delayed due to non-medical budgetary reasons. Accordingly, Plaintiff's Eighth Amendment claims under § 1983 against Nicola Wiener, executrix of the estate of Dr. Stephen Wiener, are sufficient to state a claim and will not be dismissed.

     e.   <u>Superintendent Jamie Sorber, Deputy Secretary Tammy Ferguson and Joseph Silva, Medical Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections ("PA DOC")</u>

Plaintiff's claims against the non-medical Defendants, Superintendent of SCI Phoenix Jamie Sorber, Deputy Secretary of SCI Phoenix Tammy Ferguson, and Joseph Silva, Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections ("DOC"), are based on their personal knowledge of his need for treatment and their personal action in failing to fund the treatment adequately, a non-medical reason for the delay in providing treatment. Defendants allege that this claim should be dismissed for failure to state a claim. In construing the factual allegations in the Amended Complaint liberally, the Court disagrees.

The Third Circuit has held that "[d]eliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates.'" <u>Monmouth</u>, 834 F.2d at 347 (quoting <u>Todaro v. Ward</u>, 565 F.2d 48, 53 (2d Cir.1977)). While the Third Circuit has not explicitly addressed whether a delay caused by a prison's budget to supply transportation resources sufficiently demonstrates deliberate indifference, other districts have. <u>See</u> <u>Gaines v. Choctaw Cty. Comm'n</u>, 242 F. Supp. 2d 1153, 1163 (S.D. Ala. 2003) (holding that allegation of deliberate

indifference to serious medical needs arising from failure to fund medical care stated a claim under § 1983); Cox v. Glanz, Civ. A. No. 11-457, 2011 WL 6740293, at *4 (N.D. Okla. Dec. 22, 2011) (holding that prisoner stated a § 1983 claim against non-medical defendant based on allegation that he understaffed the medical treatment facility for inmates and intentionally refused to provide adequate funding for the mental health treatment of inmates); Hoffer v. Inch, 382 F. Supp. 3d 1288, 1295, 1300 (N.D. Fla. 2019) (finding that where Secretary of Department of Corrections conceded that Hep-C was a serious medical condition and the failure to provide treatment for Hep-C virus to prisoner was due to lack of funding, prisoner was entitled to partial summary judgment and injunction on deliberate indifference claim).

In Glanz, the district court found that plaintiff sufficiently alleged a deliberate indifference § 1983 claim when she alleged that defendant "understaffed the medical treatment facility for inmates and intentionally refused to provide adequate funding for the mental health treatment of inmates" and that Defendant "learned of a [] employee's complaints about the level of staffing and the quality of the mental health treatment provided to inmates, and the employee was fired at the direction of [Defendant] for voicing these complaints." Glanz, 2011 WL 6740293, at *4. The court stated that while defendant "questions the factual allegations underlying the policies, practices, or customs identified by plaintiff, [] the Court may not disregard the well-pleaded allegations of the complaint in ruling on a motion to dismiss" and found plaintiff's claims were sufficient to state a claim under § 1983.

Here, Plaintiff alleges that Defendants Superintendent of SCI Phoenix Jamie Sorber, Deputy Secretary of SCI Phoenix Tammy Ferguson, and Joseph Silva, Director of the Bureau of Health Care Services of the Pennsylvania DOC, based on their respective positions, controlled the budget of SCI Phoenix. Plaintiff also alleges that their budgetary policy resulted in inadequate

34

transportation to attend outside medical appointments, causing Plaintiff's pain and suffering.[37] Moreover, they were aware of Plaintiff's serious medical problems.  Thus, like the plaintiff's budgetary allegations in <u>Glanz</u>, Plaintiff has sufficiently pled a deliberate indifference claim against Superintendent of SCI Phoenix Jamie Sorber, Deputy Secretary of SCI Phoenix Tammy Ferguson, and Joseph Silva, Director of the Bureau of Health Care Services of the Pennsylvania DOC.

    f. <u>Joseph Terra, Superintendent of SCI Phoenix</u>

  Plaintiff also alleges that Defendant Joseph Terra, as Superintendent of SCI Phoenix, oversaw the institutional budget that caused the delay in his medical treatment.  (Doc. No. 111 at 36-37.)  Defendant Terra submits that his Motion to Dismiss should be granted because the Amended Complaint has not alleged that he had sufficient personal involvement to give rise to a constitutional claim.  (<u>See</u> Doc. No. 158.)  In his case, the Court agrees.

  Plaintiff mentions Defendant Terra only once in his factual allegations.  Plaintiff alleges that on October 16, 2022, Defendant Terra replaced Defendant Jamie Sorber as the Superintendent of SCI Phoenix.  (<u>Id.</u> at ¶¶ 156, 292.)  No factual allegations are attributable to Defendant Terra after October 16, 2022, apart from grievance responses.  (<u>See</u> <u>id.</u> at ¶160.)  As discussed above, Plaintiff's grievance allegations do not give rise to a constitutional claim and regardless, he does not assert a grievance based constitutional claim against Defendant Terra.  <u>See</u> Section IV(A)(i), <u>supra</u>. Further, while the budgetary related claims have not been dismissed against Defendants Sorber, Ferguson and Silva, Defendant Terra was not in a position to decide budgetary matters during the time Plaintiff alleges his medical conditions went untreated.  Thus, Defendant Terra did

---

[37] For example, Plaintiff alleges that on March 18, 2020, Dr. Wiener stated that the lack of transportation resources was pushing back his appointments.  (Doc. No. 111 at 11.)

not have the required personal involvement in Plaintiff's claims.  See Rode v. Dellarciprete, 845

F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal

involvement in the alleged wrongdoing . . . Personal involvement can be shown through allegations

of personal direction or of actual knowledge and acquiescence.")  Accordingly, the Eighth

Amendment claim against Defendant Terra will be dismissed.

g.   Correct Care Solutions, LLC, ("CCS")/Wellpath, LLC

Next, turning to the corporate Defendant Correct Care Solutions, LLC, ("CCS")/Wellpath,

LLC, Plaintiff alleges that this corporate entity implemented a "custom and or practice" of

deliberate indifference to his medical needs and is liable for the constitutional violations of its

employees.[38]  (Doc. No. 111 at 42.)  CCS/Wellpath submits that Plaintiff's claim should be

dismissed for failure to state one because the Amended Complaint fails to adequately allege a

policy, custom or practice of deliberate indifference to his serious medical needs.  In addition,

Plaintiff's reliance on a theory of respondeat superior liability to hold CCS/Wellpath liable would

fail as a matter of law.[39]  (Doc. No. 125 at 26.)  In sum, Plaintiff is submitting two claims; (1)

respondeat superior liability of CCS/Wellpath for failing to monitor and enforce its own

employees' compliance with the law and (2) Monell liability for implementing a "custom or

practice" of deliberate indifference.  Although his first claim will fail as a matter of law, his second

claim alleges sufficient facts to survive the Motion to Dismiss.

---

[38]  CCS/Wellpath is an independent corporation which contracts with the Pennsylvania Department
of Corrections ("DOC") to provide medical care to Defendants.

[39]   Respondeat Superior means "[l]et the master answer."  Black's Law Dictionary (10th ed. 2014).
This theory suggests that a "master" is liable in certain cases as a principle for the wrongful acts
of his servants.  Here, Plaintiff alleges that CCS/Wellpath is responsible for the actions of the
doctors and supervisors it employs.

Initially, the Court will analyze whether CCS/Wellpath, as a corporate entity, can be held liable under § 1983.  In the seminal case of <u>Monell v. Department of Social Services</u>, the United States Supreme Court found that municipalities and local governments could be found liable under 42 U.S.C. § 1983, but emphasized that "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  436 U.S. 658, 691 (1978).

Courts have since extended <u>Monell</u> municipality liability to private corporations providing healthcare to state prisons.  In <u>Gannaway v. Prime Care Medical, Inc.</u>, the district court stated that <u>Monell</u> is now extended to include "a private corporation contracted by a prison to provide healthcare for inmates" and "pursuant to <u>Monell</u>, a private corporation can be held liable for constitutional violations only if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs."  <u>Gannaway</u>, 150 F.Supp.3d 511, 530 (E.D. Pa. 2015) (citing <u>Natale v. Camden Cty. Corr. Facility</u>, 318 F.3d 575, 583–84 (3d Cir.2003)).

As such, Plaintiff's Eighth Amendment claim against CCS/Wellpath based on a theory of respondeat superior fails as a matter of law because such suits are not permitted under § 1983.  The Court will next evaluate, however, Plaintiff's "custom or policy" allegations against CCS/Wellpath.

To sufficiently establish <u>Monell</u> liability, a plaintiff must show that he suffered a constitutional deprivation resulting from an official corporate policy or custom.  <u>See</u> <u>Natale</u>, 318 F.3d at 583–84.  A policy is an official proclamation or edict, while a custom is "so permanent and well settled as to virtually constitute law." <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996) (quoting <u>Andrews v. City of Phila.</u>, 895 F.2d 1469 1480 (3d Cir. 1990) (citations omitted)).

Guided by such principles, the Third Circuit Court of Appeals has explained that there are three situations where acts of an employee may be deemed to be the result of a policy or custom to satisfy <u>Monell</u>, thereby rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second [custom] occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

<u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted).

Here, because Plaintiff does not point to a specific formal policy or custom in his pleadings that caused his alleged deprivation of constitutional rights or violated a federal law, he must show the third prong discussed in <u>Natale</u>, that "the policymaker has failed to act affirmatively at all" and that the need to control its employees was "so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." <u>Id.</u> Several cases in the Third Circuit have discussed whether a corporation's actions in providing healthcare services to a prisoners have satisfied this standard.

In <u>Dupree v. Doe</u>, an inmate plaintiff alleged that the prison ignored his skin condition which led to a multi-month hospitalization, operations, scarring and near loss of life. No. 10-351, 2012 WL 2087788 (D. Del. June 7, 2012). He further alleged that while he did receive some medical care, defendant provided the least efficacious medical care for the purpose of "saving money" which he pointed to as the "custom or policy" to satisfy <u>Monell</u>. <u>Id.</u> at *1. Although

defendant argued that plaintiff had failed to adequately allege a policy or custom, the court found that a liberal construction of the complaint showed that plaintiff properly pled a policy, custom, or practice of placing cost containment ahead of providing necessary medical care.  Id. at *2.

In Zeigler v. PHS Correctional Health Care, Inc., an inmate plaintiff injured himself and went to Prison Health Services ("PHS"),[40] which diagnosed him with a muscle strain.  No. 11-203, 2013 WL 625364, at *2 (W.D. Pa. Feb. 20, 2013).  Despite plaintiff's continued complaints of severe pain, limping, discoloration, and bulging, he was not seen by a doctor until he transferred to another prison for a court hearing, at which time the new prison's doctor believed he had ruptured his Achilles tendon and needed an MRI.  Id. at *2.  Nonetheless, months passed before he received an MRI, after which PHS denied the recommendation for surgery because plaintiff would soon be released from prison.  Id. at *3–4.  Plaintiff alleged that medical decisions were based in large part on how long the inmate will be at the facility and not on the basis of medical need.  Id. at *3.  The court denied PHS's motion to dismiss this claim, finding that the plaintiff had "sufficiently pled that PHS has a custom of delaying medical treatment for non-medical reasons, and that delay in diagnosis and proper treatment caused the plaintiff to suffer additional pain, as well as a deformity from his improperly healed injury."  Id. at *5.

To the contrary, in Winslow v. Prison Health Services, an inmate plaintiff alleged that Prison Health Services ("PHS") was deliberately indifferent when it declined to order surgery because of alleged financial considerations.  406 Fed. Appx. 671, 672 (3d Cir. 2011).  The Third Circuit found plaintiff's allegations to be "exceedingly conclusory" and did not show a custom or policy.  Plaintiff did not indicate:

---

[40] Like CCHS/Wellpath, Prison Health Services is a private healthcare provider that contracts with the state to provide healthcare services to inmates.

> (1) what the relevant policies are, (2) what basis he has for thinking that 'policies
> to save money' affected his medical treatment, or (3) what specific treatment he
> was denied as a result of these policies. More fundamentally, the naked assertion
> that Defendants considered cost in treating Winslow's hernia does not suffice to
> state a claim for deliberate indifference, as prisoners do not have a constitutional
> right to limitless medical care, free of the cost constraints under which law-abiding
> citizens receive treatment. See Reynolds v. Wagner, 128 F.3d 166, 175 (3d
> Cir.1997)

Id. at 674.

Here, Plaintiff alleges that CSC/Wellpath's inadequate transportation funding delayed his outside medical appointments that were necessary to treat his serious medical needs.  Plaintiff recognizes that did receive some medical care; however, like the plaintiff in Dupree, he argues that due to budgetary constraints, the outside specialist care that his conditions required was delayed. Unlike the plaintiff in Dupree, who suffered a hospitalization and alleged that he nearly lost is life, Plaintiff's allegations are not as dire.  Rather, similar to the plaintiff in Zeigler, the delays in providing medical treatment caused him significant pain and ongoing problems.  Plaintiff alleges that the delays in his urological treatment caused "painful spasms, burning urges to urinate and approximately 14 trips to the bathroom per day" in addition to ongoing urological issues.  He also alleges that delays in his ear treatment caused a painful ear infection and ear problems.  Finally, Plaintiff's allegations can be contrasted with the plaintiff's situation in Winslow, because there, the plaintiff did not allege "what basis he has for thinking that 'policies to save money' affected his medical treatment" while in this case, he alleges that certain Defendants explicitly told him that his treatment was being delayed due to budgetary constraints.  In sum, Plaintiff's allegations at the motion to dismiss stage here are more like those of the plaintiffs in Dupree and Zeigler, where the claims were not dismissed, in contrast to those of the plaintiff in Winslow, where they were dismissed.  Thus, Plaintiff has sufficiently alleged that the "custom or policy" of budgetary constraints delayed his treatment and taking his factual allegations as true, caused him harm.

Accordingly, the Eighth Amendment claim alleged in Count I against CCS/Wellpath will not be dismissed.

      h.   <u>Erica Benning, Department of Corrections Director of the Bureau of Healthcare Services</u>

Plaintiff alleges that Defendant Erica Benning, in her role as Director of the Bureau of Health Care Services of the Pennsylvania Department of Corrections ("DOC"), did not enforce Pennsylvania DOC policies and knowingly and intentionally denied Plaintiff proper medical treatment. (Doc. No. 111 at ¶¶ 312-17.) Defendant Benning submits that Plaintiff's claim should be dismissed because he did not sufficiently allege her personal involvement. (Doc. No. 158 at 6-7.) The Court agrees.

Unlike Defendants Sorber, Ferguson and Silva, Plaintiff does not allege that Defendant Benning was in charge of the budget that affected his medical needs. Rather, to support her liability, he relies upon the first prong of supervisor liability as described in <u>Gibbons v. County</u>, "(1) where a supervisor establishes and maintains a policy, practice or custom which directly causes a constitutional harm." Civ. Act. No. 16-1233, 2016 WL 3878182, at *8 (E.D. Pa. July 18, 2016) (citing <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 129 n.5 (3d Cir. 2010)). To satisfy this theory:

> [A] plaintiff is required to: '(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." Rather, "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the

court that there is a relationship between the 'identified deficiency' and the 'ultimate injury.'"

Gibbons, 2016 WL 3878182, at *8 (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (internal citations omitted)).

Here, Plaintiff only submits bald assertions that Benning's general policies caused him injury. His allegations only mention an interaction with Defendant Benning once, when he alleges that on December 26, 2021 he wrote to her complaining about the delay in going to outside medical appointments. (Doc. No. 111 at ¶¶115, 252.) Plaintiff alleges that Benning responded on March 9, 2022 and May 2, 2022, advising him that he should contact non-party CHCA Huner or file a grievance about his complaints. (Id. at ¶¶ 140, 142, 279, 281.) Further, Defendants submit that Defendant Benning did not become Acting Director of the Bureau of Healthcare Services of the DOC until April of 2022, which is the role Plaintiff alleges put her in the position to decide the healthcare budget. (Doc. No. 158 at 4.) In light of the limited time Defendant Benning spent in that role and that Plaintiff's only alleged interaction with Benning is through a letter, Plaintiff has not sufficiently alleged personal involvement of Defendant Benning to sustain the constitutional claim against her. Accordingly, Plaintiff's Eighth Amendment claims against Defendant Benning will be dismissed.

   i.   Dr. Jay Cowan, CCS/Wellpath State-Wide Medical Director

Plaintiff alleges that Defendant Dr. Cowan, in his role as CCS/Wellpath State-Wide Medical Director, is responsible for "monitoring and enforcing his employee['s] compliance with PA DOC policies" and that he failed to fulfill those responsibilities. (Doc. No. 111 at 41.) Defendant Dr. Cowan submits that the allegations against him in the Amended Complaint lack a

factual basis showing his involvement and should be dismissed.  (Doc. No. 125 at 14.)  The Court agrees.

Plaintiff's claims against Dr. Cowan are very similar to the supervisory conduct he relied on to establish the claim against Defendant Benning.  Similar to his claim against Defendant Benning, Plaintiff has not alleged sufficient personal involvement by Dr. Cowan in the constitutional claim to sustain it against him.  Plaintiff only mentions Dr. Cowan in reference to letters he sent to Dr. Cowan that he received no response to.  (Doc. No. 111 at ¶¶ 122-23, 127 258-59, 264-67.)  Accordingly, Plaintiff has not alleged sufficient personal involvement by Dr. Cowan. As noted, review of a plaintiff's grievance by a medical doctor is not sufficient to establish sufficient involvement in the constitutional violation.  Simonton v. Tennis, 437 Fed. Appx. 60, 63 (3d Cir. 2011).  And here, without responses to his letters, Plaintiff cannot even show that Dr. Cowan read them.  As such, Plaintiff's claims against Dr. Cowan will be dismissed.

### B.  Civil Conspiracy (Count II)

Plaintiff also alleges in his Amended Complaint a state law civil conspiracy claim against Defendants Nicola Wiener, Dr. Hanuschak, Dr. Goldberg, Dr. Letizio, Jamie Sorber, Tammy Ferguson, Joseph J. Silva and Erica Benning.  (Doc. No. 111 at 43.)  Plaintiff alleges that Defendants conspired to delay medical care to Plaintiff.  (See id. at 43-44.)  Defendants submit that this claim should be dismissed for failure to state a claim.  The Court agrees and Count II will be dismissed in its entirety.

Plaintiff brings his civil conspiracy claim under Pennsylvania state law.  In Pennsylvania, to state a claim for civil conspiracy a plaintiff must show:

> (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage.

Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008) (citation omitted).  In applying this standard, courts have held that "[a] plaintiff's allegations must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role of each defendant allegedly played in carrying out those objectives."  Flanagan v. Shively, 783 F. Supp. 922, 928 (M.D. Pa. 1992).  "When pleading a conspiracy claim, a plaintiff cannot rely on subjective suspicion and speculation."  Jordan v. Overmyer, No. 1863 C.D. 2017, 2018 WL 4924738, at *4 (Oct. 11, 2018) (citing Young v. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991)).

Here, Plaintiff's allegations do not sufficiently allege a claim for civil conspiracy because the allegations rely on subjective suspicion and speculation.  The Amended Complaint states that "the factual allegations of the complaint support the inference of a mutual understanding. . ." but alleges no facts to bolster this claim.  (Doc. No. 111 at 44.)  He only alleges that Defendants interacted when they communicated to schedule his appointments.  He does not allege sufficient facts to show that they communicated with the common purpose of facilitating an unlawful act.  Rather, the factual allegations only speculate that Defendants engaged in a conspiracy to violate his constitutional rights.  No agreement to do an unlawful act nor to commit any overt acts in furtherance of a conspiracy are alleged.  Accordingly, the Amended Complaint fails to allege a claim for civil conspiracy and Count II will be dismissed in its entirety.

### C. Medical Malpractice Claim against Defendants Nicola Wiener, Dr. Lee Hanuschak and Dr. Letizio (Count III)

In Count III, Plaintiff alleges that Defendants Dr. Hanuschak, Dr. Letizio and Nicola Wiener, as executrix of the estate of Dr. Wiener, committed medical malpractice.  (Doc. No. 111 at 45-46.)  Medical malpractice as alleged by Plaintiff is a state tort which can be included in the Amended Complaint as part of a federal court's supplemental jurisdiction under 28 U.S.C. § 1367.

Defendants submit, however, that Plaintiff's medical malpractice claim fails because he has not produced a certificate of merit as required by the Pennsylvania Rules of Civil Procedure 1042.3. (Doc. No. 125 at 32.) [41]   The Court agrees and Count III will be dismissed in its entirety.

Because medical malpractice as alleged in Count III is a claim under Pennsylvania law, Pennsylvania Rule of Civil Procedure 1042.3 would apply to this claim.  This Rule requires that a plaintiff bringing a claim of medical malpractice or medical negligence must file a certificate of merit within 60 days after filing the complaint.  Pa. R.C.P. No. 1042.3.  The certificate must;

> attest to the colorable merit of the claim by including one of the following statements: (1) that 'an appropriate licensed professional' has supplied a written statement that there is a reasonable probability that the defendant's conduct fell outside acceptable professional standards; (2) that the claim against the defendant is based solely on allegations against other professionals for whom the defendant is responsible; or (3) that expert testimony is unnecessary for prosecution of the claim.

Perez v. Griffin, 304 F. App'x 72, 74 (3d Cir. 2008).  The Third Circuit has held that Rule 1042.3 is a substantive state law that applies in federal courts to both represented and pro se plaintiffs.  Id. "The usual consequence of failing to file a certificate of merit is dismissal of the claim without prejudice."  Smith v. Bolava, 2015 WL 2399134 at *3 (E.D. Pa. May 20, 2015) (citing Booker v. United States, 366 F. App'x 425, 427 (3d Cir. 2010)).

"Though failure to comply with Rule 1042.3 is not fatal if a plaintiff can show a 'reasonable excuse' for the noncompliance, an inmate's lack of access to their medical records and files is not a sufficient excuse for failing to file a certificate of merit."  Andre KITTRELL, Plaintiff v. BARRY SMITH, et al., Defendants., 2023 WL 8283174, at *6 (quoting Baumgardner v. Ebbert, 535 F.

---

[41] On August 21, 2023, the Third Circuit held that Pennsylvania Rule of Civil Procedure 1042.3 does not apply to claims brought under the Federal Tort Claims Act ("FTCA").  See Wilson v. United States, 79 F.4th 312, 316-17 (3d Cir. 2023).  Here, because Plaintiff brings his claim as a state law medical malpractice claim, the Third Circuit's holding in Wilson does not apply.

App'x 72, 75 (3d Cir. 2013)); see also Koukos v. Chester Cnty., No. CV 16-4602, 2017 WL 549150, at *4 (E.D. Pa. Feb. 7, 2017) ("It is well established that the requirement [of Rule 1042.3] applies to inmates who receive medical care while incarcerated.") (citing cases).   Further, noncompliance only will be excused in cases where "the matter is so simple, or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons."   Toogood v. Rogal, 824 A.2d 1140, 1145 (Pa. 2003) (quoting Hightower-Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997)).   Here, none of these exceptions for non-compliance apply.

This action essentially commenced with the filing of the Amended Complaint on March 3, 2023.  (Doc. No. 111.)  On May 17, 2023, Plaintiff submitted a purported Certificate of Merit. (Doc. No. 129.)  Notwithstanding that Plaintiff's certificate of merit was filed outside of the 60-day requirement, it also fails to meet the requirements outlined by the Third Circuit in Perez. Plaintiff's Certificate of Merit (Doc. No. 129) does not include an appropriate licensed professional's written statement.   Rather, Plaintiff executed and signed the certificate himself. (See id.)   Accordingly, as discussed above, because the requirements of Rule 1042.3 apply to Plaintiff and he has not filed a proper certificate of merit, or provided a reasonable excuse for noncompliance, his medical malpractice claims against Defendants Nicola Wiener, Dr. Hanuschak and Dr. Letizio will be dismissed.

### D.  Corporate Negligence of Defendant CCS/Wellpath (Count IV)

Plaintiff alleges a state law claim of corporate negligence against CCS/Wellpath for failure to provide him with adequate medical care.  (Doc. No. 111 at 45.)  In construing the Amended Complaint liberally, this claim is plausible and will not be dismissed.

As a threshold matter, private prison health care providers have been held liable for corporate negligence in the Third Circuit.  <u>Smith v. Community Education Centers, Inc.</u>, Civ. Act. No. 18-5299, 2019 WL 2089997, at *4 (E.D. Pa. May 10, 2019) (citations omitted).   In Pennsylvania, a cognizable claim for corporate negligence arises "not from the actions of individuals, but instead because of the policies or actions of an institution."  <u>Wheeler v. Prison Health Services, Inc.</u>, 2010 WL 3489405 at *5 (E.D. Pa. Sep. 1, 2010) (citing <u>Fox v. Horn</u>, No. 09–1028, 2000 WL 49374, at *7 (E.D.Pa. Jan. 21, 2000)).  In <u>Thompson v. Nason Hospital</u>, 591 A.2d 703 (Pa. 1991), the Pennsylvania Supreme Court explained that corporate negligence is "a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." <u>Id.</u> at 707.

Under a corporate negligence theory, a hospital can be held liable to a patient if the hospital breached one of the following: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients. <u>Id.</u>  A plaintiff must also show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm.  <u>Id.</u> at 708.  Furthermore, the hospital's negligence must have been a substantial factor in bringing about the harm to the injured party.  <u>Id.</u>

Here, the Amended Complaint has adequately pled duty, breach, and causation.  Plaintiff alleges that CCS/Wellpath was responsible for providing healthcare to inmates under a contract with the Commonwealth of Pennsylvania.  (Doc. No. 111 at 42-43.)  Further, he alleges that it failed to investigate the custom or practice of delays in medical treatment and the lack of proper and timely implementation of specialist medical care.  (<u>Id.</u>)  Finally, Plaintiff alleges that these

breaches resulted in injury, pain and suffering due to the improper treatment of his medical conditions.  (Id.)  Thus, in construing Plaintiff's pro se allegations liberally, Plaintiff has met the pleading requirements to sustain a claim of corporate negligence.  As such, this claim will not be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss (Doc. Nos. 123, 126, 157) will be granted in part and denied in part.  The Fifth and Fourteenth Amendment due process claim in Count I will be dismissed.  Further, the Eighth Amendment claim under § 1983 in Count I will be dismissed only against Defendants Joseph Terra, Erica Benning and Dr. Cowan.  The civil conspiracy claim in Count II will be dismissed.  The medical malpractice claims against Defendants Dr. Hanuschak, Nicola Wiener and Dr. Letizio in Count III will be dismissed.  The corporate negligence claim against CCS/Wellpath in Count IV will not be dismissed.  Accordingly, the following claims remain against named Defendants.  They are:

- An Eighth Amendment Claim under § 1983 (Count I) against Dr. Goldberg, Dr. Letizio, Dr. Lee Hanuschak, Nicola Wiener, as executrix of the estate of Dr. Stephen Wiener, Superintendent Jamie Sorber, Deputy Secretary Tammy Ferguson, Joseph Silva, Director of the Bureau of Health Care Services of PA DOC, and Correct Care Solutions (CCS) LLC/Wellpath LLC.

- A state law Corporate Negligence (Count IV) claim against Correct Care Solutions (CCS) LLC/Wellpath LLC.

An appropriate Order follows.